[No. H030724. Sixth Dist. Dec. 15, 2009.]

CECELIA McCOY, as Trustee, etc., Plaintiff and Appellant, v.
M. DOUGLAS GUSTAFSON et al., Defendants and Appellants.

**COUNSEL**

Kathleen M. Clack for Plaintiff and Appellant.

Musick, Peeler & Garrett, Gary L. Wollberg and Timothy J. Daley for Defendants and Appellants.

**OPINION**

**RUSHING, P. J.—**

### I. INTRODUCTION

In 1986, Margaret McCoy wrote a letter to the owners of the Grove Laundry in Pacific Grove, complaining that "black oil is seeping up between the laundry" and the house owned by Margaret and Edward McCoy on

property downhill from the laundry (the downhill property). She asserted that it was the laundry's "spill of black oil" and that they should clean it up.

The Blackwells, then owners of the laundry, made some efforts to clean up the oil contamination on the laundry property. After acquiring the laundry property in 1988, in 1993 M. Douglas Gustafson demolished one of the buildings and had almost 560 tons of soil excavated from the laundry property, as monitored and approved by the Monterey County Health Department (the Health Department).

Because the downhill property has remained contaminated, in 2002 the McCoys filed this civil action against the current and former owners of the laundry property.[1] As the jury was instructed in this case, to release fuel oil into a neighbor's soil without consent is a trespass, and to interfere with the free use and enjoyment of a neighbor's property by contaminating it is a nuisance.

California law classifies nuisances and trespasses as either continuing or permanent. "An action for trespass upon or injury to real property" (Code Civ. Proc., § 338, subd. (b))[2] must be filed within three years of the discovery that the property has been contaminated by a permanent nuisance (*Mangini v. Aerojet-General Corp.* (1996) 12 Cal.4th 1087, 1096, 1103 [51 Cal.Rptr.2d 272, 912 P.2d 1220] (*Mangini II*)), while a new action can be filed every three years for the damages caused by a continuing nuisance or trespass. A nuisance is regarded as continuing if "the nuisance can be remedied at a reasonable cost by reasonable means." (*Id.* at p. 1103.)

Based primarily on the 1986 letter complaining about oil seeping from the laundry, the trial court summarily adjudicated that plaintiff's claims for negligence, permanent nuisance, and permanent trespass were time-barred. The trial court later denied plaintiff's motion to amend the complaint a month before trial.

Plaintiff proceeded to trial on theories of continuing nuisance and trespass. The jury concluded by way of a special verdict form that two defendants, M. Douglas Gustafson and his corporation, the Tamarind Group, Inc., had intentionally, recklessly, or negligently caused oil or other petroleum products

---

[1] Ownership of the downhill property was placed in a trust while Edward and Margaret McCoy were alive. Both of them died while this lawsuit has been pending. On December 10, 2005, the trial court ordered their daughter, Cecelia McCoy, the trustee of the trust, to be substituted in as a party in place of her parents. In view of this substitution, we will refer to Cecelia as the sole plaintiff.

[2] Unspecified section references are to the Code of Civil Procedure.

to be released onto the downhill property, thereby creating a condition that caused harm and interfered with plaintiff's free use and enjoyment of the downhill property.[3]

The jury was instructed, among other things, that, to establish a nuisance, plaintiff was required to prove "that the condition can be repaired, or abated, by reasonable means and at a reasonable cost." To establish a trespass, plaintiff was required to prove "that the unauthorized entry can be removed, repaired, or abated, by reasonable means and at a reasonable cost." Given the choices "[y]es," "[n]o," or "[u]nknown" in question No. 5 on the special verdict form (pertaining to nuisance and trespass), the jury determined that it was "unknown" whether the condition of plaintiff's property could "have been repaired or abated by reasonable means and at a reasonable cost." As directed by the verdict form, in light of this special verdict, the jury bypassed the remaining questions about damages and signed the verdict form.

We will conclude for the reasons stated below that this special verdict established the statute of limitations defense, so the trial court should have entered judgment in favor of the Gustafson defendants based on this special verdict, as they contended in a motion for judgment notwithstanding the verdict. Based on the lack of evidence at trial that the contamination of the downhill property is reasonably abatable, the jury could not have found otherwise. We will further conclude that this failure of proof did not result from any erroneous ruling by the trial court in connection with granting summary adjudication, denying plaintiff's motion to amend the complaint, or limiting the expert testimony presented by plaintiff.

This action did not end with this special verdict. The trial court directed the jury to deliberate further, after which it determined by special verdict that the Gustafson defendants acted with malice, fraud, or oppression in creating a nuisance, but not by releasing oil. After a bifurcated trial, by a separate special verdict, the jury awarded punitive damages of $250,000 against M. Douglas Gustafson and $250,000 against the Tamarind Group, Inc.

Plaintiff and the Gustafson defendants both challenged this outcome, with defendants moving for a judgment notwithstanding the verdict and an order vacating the punitive damages award, and plaintiff making a motion for a

---

[3] The jury also found that defendants Homescapes, Inc., and CTE Properties, Inc., corporations formed by Thomas and Claude Finklang, who bought some of the laundry property from Gustafson, had not created a nuisance or trespassed on plaintiff's property.

The trial court had previously granted motions for nonsuit by defendants Galen Blackwell and Thomas Finklang. Plaintiff's appeal does not challenge either these nonsuit rulings or this part of the special verdict. The only other parties to the appeal are M. Douglas Gustafson and the Tamarind Group, Inc. (the Gustafson defendants).

new trial. The trial court deemed defendants' motion also to be seeking a new trial. The court ruled orally, "I think that the verdict form was unfortunately hopelessly mired in confusion and ambiguity, such that I think a motion for new trial has to be granted, both as to the issues of compensatory damages, punitive damages, the corporate and individual standing of Mr. Gustafson." Both sides have appealed from this ruling, and plaintiff has appealed from the original judgment and related prior rulings.

We will conclude, for reasons stated below, that the trial court erred in granting the motion for new trial and denying the motion for judgment notwithstanding the verdict. Accordingly, we will reverse the order granting a new trial and direct entry of a judgment in defendants' favor.

## II. PRETRIAL PLEADINGS AND RULINGS

### A. *The Pleadings*

The complaint, filed April 29, 2002, alleged the following. Plaintiffs Edward and Margaret McCoy owned residential property downhill from the Grove Laundry in Pacific Grove. While defendants Galen and Gary Blackwell owned and operated the laundry, bunker oil was discharged into the ground, and the oil has migrated through the groundwater and soil on and under the downhill property. Defendant M. Douglas Gustafson, individually and as a trustee of the M. Douglas Gustafson Trust, and through the corporate defendants Spindletop, Inc., and the Tamarind Group, purchased the uphill property from the Blackwells, sold it, repossessed it, and attempted to clean up the contaminated soil on the uphill property. Gustafson sold part of the property to defendants Thomas and Claude Finklang, doing business through the corporate defendants CTE Properties, Inc., the Grove Homescapes, and the Grove Innerscapes (the Finklang defendants). The Finklang defendants demolished the laundry and replaced it with a retail and residential building. In July 1999, the McCoys discovered groundwater filled with petroleum during excavation of a trench about 18 inches deep on their property. The McCoys alleged causes of action for negligence, nuisance per se, private and public nuisance, and trespass as a result of the contamination of their soil. They requested damages representing the diminution in their property value, interference with their use of their property, their costs of improving their property and testing for toxic wastes, and punitive damages.

M. Douglas Gustafson, individually and as a former trustee of the M. Douglas Gustafson Trust, and the Tamarind Group, formerly doing business as M. Douglas Gustafson & Co., Inc., and Spindletop, Inc., filed an answer alleging a number of affirmative defenses, including that plaintiff's action was barred by the three-year statute of limitations for damages to real property.

B. *The Motions for Summary Adjudication*

On October 27, 2005, the Gustafson defendants filed a motion for summary adjudication asserting that the statute of limitations barred plaintiff's claims of permanent nuisance, negligence, and trespass. The motion was heard on January 27, 2006, and taken under submission. The motion was based primarily on an exchange of letters between Margaret McCoy, Marc Blackwell, and the Health Department from April 1986 through September 1987.

On April 22, 1986, Margaret McCoy wrote to Marc Blackwell that Mrs. Walker had complained of oil seeping up between the Grove Laundry and the downhill property at 164 12th Street in Pacific Grove that Walker rented from Margaret and Edward McCoy. Marc Blackwell was the son of Galen Blackwell, one of the owners of the Grove Laundry. By letter dated April 29, 1986, Marc Blackwell accepted full responsibility for the situation and offered to clean up the downhill property. He noted that he had been in contact with the Health Department. On September 3, 1987, the Health Department wrote, asking Blackwell to establish a cleanup schedule in coordination with his consultant, Russell Juncal of WaterWork. One of the elements to be scheduled was installation of monitoring wells.

WaterWork performed some work on the laundry property by January 1988, when the Blackwells sold the property to M. Douglas Gustafson.

Plaintiff filed opposition to the motion. Plaintiff acknowledged that the three-year limitations period of section 338, subdivision (b) applied, but argued that the downhill property suffered no "appreciable and actual harm" until "after confirmation of the soil sample showed high levels of petroleum contamination were present in the soil and groundwater underneath the property." The written opposition made no claim that the state statutes of limitations were preempted by the federal Comprehensive Environmental Response, Compensation, and Liability Act of 1980 (CERCLA; 42 U.S.C. § 9601 et seq.).

On March 10, 2006, Galen Blackwell filed a motion for summary judgment or summary adjudication based on a release of liability executed by Gustafson and the statute of limitations.

On March 27, 2006, the trial court ruled in writing that the McCoys were on notice of possible oil contamination of their property in 1986, so claims of negligence, negligence per se, trespass, and permanent nuisance were barred by the applicable three-year statute of limitations long before the lawsuit was filed in 2002. While they could proceed on claims for continuing nuisance

and trespass, their damages were limited to those incurred within three years of their lawsuit and did not include diminution in market value or damages for future harm.

On May 2, 2006, plaintiff sought clarification of the summary adjudication ruling. This written motion made no reference to CERCLA.

On May 12, 2006, plaintiff filed opposition to Blackwell's motion for summary adjudication. This opposition did not mention CERCLA.

Plaintiff's motion for clarification was heard on May 19, 2006, and taken under submission.

On June 9, 2006, Blackwell's motion for summary adjudication was heard and taken under submission.

On June 12, 2006, the court issued an order on the motion for clarification, essentially indicating that its prior ruling needed no clarification. On the same date, it granted Blackwell's motion for summary adjudication, reaching the same conclusions about the statute of limitations, and recognizing that Gustafson had settled prior litigation with the Blackwells by releasing them from further liability for any contamination.

On June 28, 2006, at a hearing on motions in limine, the trial court clarified that its summary adjudication ruling was intended to apply to plaintiff's purported claim for nuisance per se.

C. *The Motion to Amend the Complaint*

On May 26, 2006, with a pending trial date of June 27, 2006, plaintiff filed a motion seeking leave to file a first amended complaint. This motion was heard on June 2, 2006, and taken under submission. On June 12, 2006, the court denied plaintiff's motion to amend the complaint, giving the following written explanation. "This case arises from a release of 'bunker oil' at the Grove Laundry site in 1986. Evidence in the prior motion showed Plaintiffs were on notice of oil contamination in their property in 1986, but did not file this lawsuit until 2002. Plaintiffs now seek to allege new causes of action stemming from remediation efforts made by Defendants on their own property in 1987 and 1993.

"Plaintiffs seek to allege that Defendants failed to obtain permits and install monitoring wells as directed by the County and the State. Additionally, Plaintiffs claim Defendants failed to record or provide technical information

as required by the State. Lastly, in 1995, Defendants allegedly discovered oil in postholes while erecting a retaining wall, and 'turned a blind eye' to it.

"The amendment does not appear to be appropriate. The 'bunker oil' was released onto Defendants' property in 1986. Evidence before the court on the summary judgment motion indicated Plaintiff Margaret McCoy was aware of the black oil 'seeping' onto her property in 1986–87 and wanted Defendant Blackwell or the County to replace the soil and clean up the oil at that time. No remediation efforts on Plaintiffs' property ever took place.

"The fact that Defendants remediated their own property unsuccessfully more than once, and the fact that the County has undertaken remediation efforts with Defendants, do not create new causes of action for Plaintiffs."

### III. The Trial

#### A. *Motions in Limine*

Plaintiff's counsel, Kathleen Clack, made a motion in limine to exclude evidence that had not been produced in discovery. At a hearing on June 28, 2006, the trial court essentially granted the motion.

Representing the Finklang defendants, Mark Hudak made a similar motion in limine to exclude any evidence of the cost of remediation or repairs, because none of plaintiff's three designated experts was designated to testify on that topic. He pointed out that, at his deposition, Michael Burns stated that he did not know how much soil would need to be excavated from the downhill property or what the cost of excavation would be. Rifaat Sammy Salem also had made no estimate of the amount of soil that needed to be excavated from the downhill property. Salem's partner, Todd Polvado, had estimated only the cost of the engineering work for replacing the retaining wall, not the total cost of the wall.[4]

Clack admitted that none of those experts was a cost estimator. Michael Burns "wasn't hired to give a cost estimate." Polvado had made no attempt to "cost out any of the work." At his deposition on June 8, 2006, Polvado stated he " 'can't speak to the amount of soil that might need to be excavated at this point.' " However, according to Clack, Polvado had given a contractor, Mr. Mosebach at DMC Construction, a scope of the estimated work for soil excavation, and the contractor had come up with a number. Clack asserted

---

[4] In her expert witness designation dated April 17, 2006, Clack represented under penalty of perjury that "Polvado's anticipated testimony will be related to his opinions regarding the civil engineering of and on the subject property of 164 12th Street, and 472 Lighthouse/166 12th Street, Pacific Grove."

that Polvado could recite this estimate during his testimony and that it was common knowledge what it costs to remove a cubic yard of dirt. The court disagreed, saying it was a matter of expert testimony. The trial court stated, "You're in trouble, Ms. Clack. It appears that you don't have the evidence."

Hudak pointed out that Polvado had not seen the DMC estimate at the time of his deposition. Under questioning by the judge, Clack admitted that Polvado never said whether the estimate was reasonable or not. Quoting from Polvado's deposition, DMC's various estimates pertaining to the removal of different amounts of soil, whether 120 cubic yards or 800 cubic yards, were not based on information he provided.[5] Mosebach was not designated as any kind of witness.

Clack explained to the court that she did not require more of her experts because the Regional Water Quality Control Board had been pressing Gustafson to obtain estimates for remediation work.

The trial court granted the Finklang defendants' motion in part.

Clack suggested that defendants could conduct another deposition of Polvado, because he "was under terrific strain" in his deposition, so he became "somewhat flustered." The court said it was unaware "of any Evidence Code or Code of Civil Procedure exception for being flustered at a deposition." She had earlier suggested that he had not had time to review and correct his deposition, so he should be given time to do so.

Plaintiff did not oppose a motion in limine to exclude her experts from presenting new opinions.

---

[5] Only limited parts of the DMC Construction estimate of May 26, 2006, were quoted during argument on the motion in limine. This written estimate does appear in the clerk's transcript. We note the following statements. "No information has been provided specifying the depth of contamination. For the purpose of this estimate, we will assume a removal depth of approx. 6 feet below grade level." Based on this assumption, it was estimated that 120 cubic yards of soil would be removed beneath the retaining wall and an additional 800 cubic yards would be removed beneath the house, at a total cost for the removal alone of $74,750. It would cost an additional $45,000 to remove another 800 cubic yards of contaminated soil supported by the retaining wall, assuming a removal depth of 10 feet. Additional costs were estimated for disposing of the soil ($5,000), disposing of the wall ($1,500), installing temporary supports for the house ($25,000), backfilling the excavation ($30,000), and constructing a new retaining wall ($7,500) and a footing for the house ($56,000). The total cost of this estimate was $244,750.

### B. *Trial Evidence*

We will set out separately the evidence at trial of soil contamination, the property owners involved, past cleanup efforts, and whether there was any evidence at trial that the contamination could be abated by reasonable means at a reasonable cost.

### 1. *The Discovery of Oil Migrating Downhill Underground*

A laundry known as the Grove Laundry was constructed in Pacific Grove at 472 Lighthouse Avenue in 1914. The Blackwell family acquired the laundry in 1956 and operated it until they sold the property in January 1988.

In 1947, Edward and Margaret McCoy acquired the downhill property at 164 12th Street. The house on it was originally constructed in 1895. After living on the property for a little over two years, they relocated to southern California and rented out the residence. The Walkers were longtime tenants.

Michael Burns is an engineering geologist retained as plaintiff's expert in environmental geology. According to documents he reviewed, until 1980 the laundry used boilers fueled by fuel oils like bunker oil to heat the water used for cleaning. The basement of the laundry was unpaved soil. Over time, there were three boilers and three sumps that were used for collecting oil. In 1980, there was a reported accident where up to 200 gallons of fuel oil spilled onto the floor of the basement. Soapy water, which leaked into the basement, helped oil seep into the soil.

Burns explained that petroleum hydrocarbons in the soil will float in groundwater when it rises to the level of the contamination. Groundwater containing contamination will flow downhill from the source along underground pathways to receptor soil. This is what happened with the fuel oils released in the basement area of the laundry. They migrated into the groundwater, through the foundation wall, and onto the downhill property. He does not know when oil first began migrating onto the downhill property or how much oil has reached the downhill property.

In a letter dated April 22, 1986, Margaret McCoy complained to Marc Blackwell about oil from the laundry seeping up on her property.

On July 25, 1986, there was a complaint to the Health Department about bunker oil on the walk between the laundry and the downhill property. At the time, Jon Jennings was the supervisor of the hazardous materials program for the Health Department's Division of Environmental Health. A field inspector for the Health Department confirmed that there was oil on the downhill

property and reported that sump soil on the laundry property had been contaminated for about 20 years. The Blackwells promised to remove the contaminated soil.[6]

The State Regional Water Quality Control Board (the Water Board) was notified, but was not interested in 1988 because the groundwater was not drinkable. The Water Board's jurisdiction is groundwater, while the Health Department's jurisdiction is soil.

In January 1988, Gustafson bought the laundry property, on which there were two buildings, from the Blackwells. He sold it to Tom DiMaggio 11 months later. On February 13, 1991, the Health Department contacted DiMaggio about studying the contamination on his property. DiMaggio discovered there was contaminated soil from a sump. DiMaggio sued Gustafson, and Gustafson sued the Blackwells for not disclosing the soil contamination. One outcome of the litigation was that Gustafson took back the property from DiMaggio.

Another outcome was that there were cleanup efforts involving excavation of the laundry property in 1993. On November 8, 1993, the Health Department wrote a clearance letter approving Gustafson's cleanup efforts.[7] On November 30, 1993, Gustafson and the Blackwells reached a settlement of their litigation which acknowledged the clearance letter and that the Blackwells had removed all the contaminated soil at their expense, with Gustafson to reimburse them $40,000 for costs if he sold both of the parcels that were on the market.

In February 1994, Gustafson sold part of the laundry property to CTE Properties, Inc., a corporation of Claude and Thomas Edward Finklang. Gustafson has retained ownership of the property at 166 12th Street, the property on which three sumps were found during the 1993 excavation.

Before acquiring the property, Thomas Finklang was aware of the contamination issues on the adjoining property that Gustafson retained and the clearance letter. CTE did extensive renovation on the remaining building on his property. It dug a basement and put a foundation under the building. It removed virtually everything under the original building down to the bedrock. Despite the daily presence of government inspectors, there were no reports of soil contamination. Some of the soil was used for berms on the City of Pacific Grove's golf course. Other soil went to the Monterey Peninsula Airport.

---

[6] The various efforts at cleaning up the contamination are detailed separately in the next part.

[7] The letter is quoted in the next part (p. 75, *post*).

Rhett Smith, a friend of Thomas "Bo" Finklang,[8] was involved in the construction of the basement. According to Smith, some of the debris from excavating under the building was put on Gustafson's lot and buried under soil that was excavated from under the building.

Roger Stang was a contractor involved in the renovation. Before he got involved, all the soil had been removed to a depth of 10 feet. He stored his building materials on the vacant lot owned by Gustafson. Stang was asked to dig fence holes on Gustafson's property adjoining the downhill property. According to Stang, when his men dug the holes, they were nauseated by the holes filling with oil, so they stopped digging the holes.

According to Bo, Stang constructed what was intended to be a temporary retaining wall on Gustafson's vacant lot to give the resident of the downhill property some privacy. Smith took a number of photographs of the renovation work. He also made a videotape that showed oil coming up in fencepost holes that were 30 inches deep. Posts were put in the holes and the retaining wall and a fence were quickly completed.

On the Finklang property, a three-story building with a basement replaced the existing one-story building. When the renovation was complete, Thomas Finklang set up an importing business on the premises.

At trial, Thomas Finklang denied that he had ever seen Smith's videotape. When asked by his counsel if he was surprised to learn that there was oil appearing in postholes on plaintiff's property, he answered: "It wasn't a surprise to anybody. Mrs. Walker knew about it. The McCoys knew about it. We knew about it. The City knew about it. The City of Pacific Grove talked about it. Everybody knew it was there."

Cecelia McCoy, the daughter of the original property owners, moved in to the downhill property in December 1998 and began improving it. She hired a contractor to put in a curtain drain between the retaining wall and the house. The contractor dug trenches about 18 inches deep in the yard in July 1999. He called her to say that he was finding oil in the trenches, so he could not continue the work. He covered the trenches with plywood.

She had the soil tested. When she got the results showing contamination above regulatory action levels, she contacted the Health Department in August 1999. They said they would look into it. She heard from the district attorney's office. She later learned the Water Board was going to take over the case. It was her understanding that they were going to direct the cleanup.

---

[8] To avoid confusing the son with the father, we will refer to the son by his nickname, Bo.

Nothing had been done to remove the oil from the downhill property before the lawsuit was filed in April 2002. Due to the contamination, she has been unable to improve the property, enjoy it, rent it, or sell it without losing money.

## 2. *Past Efforts at Abatement and Remediation*

In 1986, after Margaret McCoy's written complaint about oil on the downhill property, Jon Jennings recollected that the Blackwells were pumping oil out from the laundry property before the Health Department got involved. The Health Department directed them to clean up the contaminated soil and to obtain expert help. The Blackwells hired Russell Juncal's company, WaterWork, to identify the extent of the contamination. On June 15, 1987, WaterWork proposed to remove all the contaminated soil it could without disturbing the foundation of the structure.

According to Jennings, there were several possible methods of dealing with soil contamination. Monitoring wells would be installed to keep track of the contamination.[9] One method was to construct an underground impermeable slurry wall to contain the contamination, as well as a collection system allowing the contamination to be pumped out. Removing the source was another alternative. In the case of the laundry property, the attempt was to remove all the visible contamination.

The Health Department did not direct the Blackwells to remediate the downhill property. There were at least two reasons why. The first step before performing a cleanup is to locate the source and extent of the contamination. They were focused on the first step. Also, it was impractical to remediate the downhill property because there were a house and garage on it. The most likely method for cleaning up the downhill property would involve removing the house from its foundation and excavating the soil from two to 20 feet down. They probably would have directed remediation of the downhill property if there appeared to be a significant health risk.

It was Jennings's impression that the contamination was not removed before the property changed ownership. On May 21, 1990, WaterWork produced a draft report addressed to Gustafson reflecting its conclusions about the extent of the contamination based on its investigation, which began in 1987, and estimating the costs of the cleanup that might be required by the Health Department and the Water Board. Michael Burns relied on this report in forming his opinion about the soil contamination.

---

[9] It was Jennings's recollection that at least three monitoring wells were installed. However, Gustafson testified that he did not install any monitoring wells because no one asked him to. It appears that Jennings may have been discussing an earlier timeframe than Gustafson was.

During the pendency of the litigation between Gustafson and the Blackwells, on August 16, 1993, Spindletop, Inc., obtained a demolition permit for half of the laundry building. Gustafson had the closed building demolished to make it easier to remove the bunker oil and to facilitate sale of the property.

In Burns's opinion, the existence of buildings on the laundry property inhibited the investigation and removal of soil contamination. Removing a building facilitated the removal of the contamination. The downside of removing a building is that the building no longer deflected rain from the property, so it would enter the soil and the groundwater. That would mobilize the remaining contamination. The effect of a retaining wall would be to pool water on the uphill property, contributing to mobilizing the remaining contamination.

On September 23, 1993, Spindletop, Inc., hired the Don Chapin Company to excavate the contaminated soil. The original estimate was to remove 44 cubic yards, 75 tons, of soil at a cost of $15,525. In cleaning up contaminated soil, one often does not know the extent of the contamination until excavating and sampling the soil. The property owner hired the contractor, but the contractor obeyed the directions of the Health Department as far as what to do to remove the contamination. Cory Welch was a hazardous materials specialist with the Health Department who visited the jobsite two or three times a day.

The work, involving excavating soil, transporting soil and debris away, having the remaining soil sampled by a laboratory, pumping oil from sumps, and more excavation, began on October 18, 1993, and ended on October 27, 1993. Three sumps, all redwood containers, were uncovered, with the third being located and excavated on the final day of work. One sump was near the property line with the downhill property. Eventually the excavators removed about 560 tons, 25 truckloads, excavating to about 15 feet deep. They stopped excavation when Welch allowed them to. According to Welch, they "had, basically, dug out everything on the Gustafson property that was possible," down to the granite bedrock interface. The total charge for the work was $104,185.58.

Gustafson was upset about the excavation's being more extensive and expensive than the original estimate. Gustafson recalled that the Chapin Company backfilled the excavation, but according to the company's records, he directed the company not to backfill the property and received a credit of $13,993.75. With a discount of $2,191.83 for prompt payment, the Blackwells paid $80,191.83 and Gustafson paid $7,808.17.

On November 8, 1993, Welch sent the following letter to Gustafson. "This office has received soil samples taken from 472 Lighthouse, Pacific Grove,

the site of the former Grove Laundry. Samples were taken 10' below ground surface at the bedrock fill interface of two sumps that were uncovered during soil excavation. These samples indicate that localized contamination still exists at the immediate location of the former sumps.

"All other possible soil contamination has been removed from the site. It has been previously noted that offsite migration has occurred primarily to the Walker residen[ce] (south) and to 12th Street (east). At this time it is impractical to further excavate this known contamination.

"It is the view of this department that no significant health risk exists at this location at this time. Please be advised that this letter does not relieve you of any responsibility mandated by the California Health and Safety Code if additional or previously unidentified contamination is discovered at this location. If any land use patterns change regarding the Walker residence, or of 12th Street, additional remediation may be required."

This letter was not addressed to the McCoys. Gustafson recalled that he had asked Welch to provide them with a copy. Welch did not recall such a request nor did he recall notifying them of the letter.

Almost six years later, on August 16, 1999, Welch sent another letter to Gustafson, notifying him that high levels of petroleum hydrocarbons had been discovered in the groundwater and soil of the downhill property as a result of construction activities, and that he was expected to mitigate it. His response was that he had done enough. When the Health Department gets no response, it turns the matter over to the district attorney.

Beginning with a letter on December 22, 1999, and continuing after the commencement of this lawsuit in April 2002, the Water Board has sent Gustafson numerous letters drafted by Dr. Wei Liu identifying Gustafson as responsible for investigating and cleaning up contamination on his property, as well as the downhill property. He was directed to send the board regular reports on his progress. Gustafson hired Doug Cook of ATI to do some soil tests.

According to Gustafson, because he had difficulties meeting some of the Water Board's deadlines, he was prosecuted and convicted and placed on probation for three years.

3. *Evidence of the Potential Future Costs of Abatement and Remediation*

Of plaintiff's three experts at trial, two were partners in the Salem Engineering Group. Rifaat Sammy Salem is a licensed geotechnical engineer

and Wayne Todd Polvado is a licensed civil engineer. Polvado acknowledged that it was not within his expertise to say how much soil needed to be excavated in order to complete the remediation of the downhill property. That was up to the environmental consultant, Michael Burns. Polvado had simply noted that the existing retaining wall between the properties needed to be replaced and he had a plan for doing that. He would want to do some soil borings first. He estimated that it would cost $20,500 for his firm's engineering services division to replace the retaining wall. Polvado had no idea how deep the contamination was near the wall. Salem likewise had no opinion on whether the soil needed to be excavated on the downhill property or how much would need to be excavated. He and his partner were not asked to design a remediation plan. Neither Polvado nor Salem believed that the leaning of the retaining wall was related to any contamination of the soil.

According to Polvado, if excavation had to be done under the house on the downhill property, the house could be supported by a system of beams and piers while the work was done, and, afterwards, a new footing system would have to be built.

Burns could not say if there was more or less contamination on the downhill property at the time of the trial in 2006 than in November 1993. He suspected it might be less due to natural bioremediation, which involves microbes eating the contaminants in the soil. He could not say how much oil had migrated onto the downhill property since 1993. It was not contamination that caused the retaining wall to lean.

It was the opinion of Burns that the contamination on the downhill property could be remediated by excavating the soil. That was a cheaper alternative than bioremediation. In order to abate the problem, first the source of the contamination on the uphill property would have to be located through sampling and testing of the soil. There were still some unknown sources of contamination on the laundry property, maybe in pockets in the bedrock. The existing retaining wall would have to be replaced and the soil removed. A French or curtain drain could be installed on the uphill property to divert groundwater and contamination. There would have to be sampling, testing, and excavation on the downhill property until the contamination was removed.

Burns did not have enough information to say where the contamination on the uphill property was and whether it was under the existing building. It would cost $225 to $250 to excavate one cubic yard. He did not know how much soil needed to be removed from the downhill property to remediate it. He had no opinion on what it would cost to remediate the property by excavation. He had not come up with a remediation plan to fix the downhill

property, because it was his understanding that the Water Board had directed other people to come up with a plan. He had not done soil samplings because other people had been doing them at the direction of the Water Board.

Burns had estimated his future involvement as reviewing the remedial plans submitted to the Water Board, inspecting the area, and reviewing the remedial work, at a cost of $8,740.

### C. *Rulings During Trial*

After plaintiff's expert Polvado was precluded from discussing the DMC Construction estimates for excavation, Attorney Clack attempted to have plaintiff herself testify to the contents of this estimate. After a hearing in the jury's absence, the court sustained objections on the grounds that the evidence was hearsay and it was the subject of expert testimony.

The first witness testified on July 6, 2006. Plaintiff called Dr. Wei Liu to testify on the fifth day of testimony. Liu works for the Water Board. He drafted a series of letters to Gustafson, the first dated December 22, 1999, identifying Gustafson as a party responsible for contamination reported on the downhill property and directing him to investigate and clean up the contamination. Finklang's counsel objected to the admission of the letters into evidence.

At a hearing in the jury's absence, Hudak objected that the letters were hearsay, prejudicial in identifying responsible parties, and irrelevant. Clack explained, "I really want him to testify to the facts that are contained in the letters. That was my primary purpose in bringing it here—him here." "[T]here's a great deal of information, in these letters, that Dr. Liu has prepared, that can actually define much of what has transpired on this property."

When the court asked what new facts the letters contained, Clack responded that they talked about enforcing the Water Code and the scope of the work. When the court asked how it was relevant to proving nuisance or trespass, Clack responded that it was "associated with whether or not the nuisance continues. This tells you whether or not you can abate the nuisance."

The court said that it would be appropriate to have an expert testify on those topics. Clack admitted that Liu was not designated as an expert. She reiterated that she wanted the contents of the letters in. The court stated: "That's the problem. There's a problem because, if once again you're asking for testimony of an expert nature without designating [an] expert, without

calling the people that did the work, I assume this talks about work that needs to be done, who would be testifying as experts, if they were called. Somebody who did borings, somebody who did measurements, somebody who did soil samples, all those people would be experts; they would testify as experts. And, if they're not going to testify, and he's going to give an opinion about what they did, as Mr. Burns did, of other people's opinions, that they be listed as an expert for that purpose."

Clack asserted that Liu had personal knowledge of his own work. The court replied, "Personal knowledge, if you have an expert—if what he testifies to is beyond a layperson's knowledge, the fact that he's done it, does not permit him to testify to it unless he's disclosed and designated under the Code of Civil Procedure as a witness that will be giving expert testimony. So, that the other side has the opportunity in advance to take his deposition to compare what he knows, how he knows it, to what other people know, where he got that information from and to be prepared to present that at court. If that hasn't occurred, if he's not going to be designated as an expert, then you're just asking him—then he's a lay witness. He's not relevant as a lay witness. He's only relevant as an expert witness. He's not giving any lay opinion."

Returning to the topic, the court stated, "Because he's not been designated as an expert, the truth contained in the letters is not admissible." "And, had Mr. Liu been designated as an expert, it would probably all come in for the truth." It would be asking too much of the jury to ignore the truth of the contents of the letters and rely on them just to establish that defendants were notified about the contamination of the downhill property.

Clack asked if Liu could testify as to what he had personally done, which was determining what kind of information needed to be gathered about the site. The court asked, "What is it that he has done that—for which he would not be required to be testifying as an expert?" Clack responded that he analyzed data from soil samples and determined whether more samples were needed. The court observed: "That seems to be in the nature of somebody who's not a layperson who has the special background, training, education, and experience to give opinions in those areas. [¶] In that sense, he's acting as an expert would, and in the absence of his having been disclosed as an expert would be a miscarriage of justice to let him testify, because he hasn't been deposed or examined because he wasn't disclosed as giving expert opinion." In light of this indication, Clack ended her direct examination of Liu.

D. *Jury Arguments*

We review plaintiff's arguments to the jury with special attention to the topics of the reasonable costs of abatement and remediation. Her opening argument included the following. "We've learned from our experts, that they've advised us that, in order to remediate her property, and abate the nuisance on her property, you can excavate the soil. [¶] You can excavate the soil, and you can do the remediation, because the source is not on her property. We can also abate what is coming off the adjacent properties. We can do it through excavation and proper drainage, to protect her property from getting more of this. . . . There are things you can do with curtain drains and pumps and sumps." "We've also got some costs for the work that we think needs to be done—that we know can be done."

After arguing that all the defendants were responsible for oil continuing to migrate downhill, plaintiff stated: "So then, we ask ourselves, can this problem be remediated or abated? Okay. Number one, her soil can be cleaned up because she isn't the source. Her soil can be excavated." "Our experts have, they've told you excavation is the preferred method. They've, also, told you that putting in drainage is a preferred thing to do."

"Now, we've heard about some of the costs that are involved in this." For Salem Engineering to replace the existing retaining wall it would cost $20,500. Michael Burns would charge $8,740 for his future efforts. If plaintiff had to leave her house because it was lifted, it would cost her $2,900 per month to rent a comparable house. "If you figure it's going to take three to six months to get that excavation done, get it tested, you figure it's 2,900 for a while."

"So then, we talk about what is a reasonable cost to remediate the soil or to abate the nuisance? Well, one thing we do know is that, in 1993, it costs Mr. Gustafson and the Blackwells $104,000. At least we know it's not going to be cheaper than . . . that for 559 tons." "The reasonable cost of the repair is well less than the value of this property," which was stipulated to be $798,000.

"We know that the nuisance can be abated, from flowing on to the McCoy property. . . . They would like to know more about the source, so that it can be best identified. But, we do know that there are devices that can be used, the curtain drains, capturing it at the right places, doing the right retaining wall."

Plaintiff's closing argument included the following on these topics. Quoting witness Jon Jennings, " 'To clean up the contamination normally means to

excavate down to a depth of anywhere from, you know, two or three feet down to, you know, 20 feet and remove all of the contamination on the property. You would disrupt the foundation of the existing house, and the most likely scenario would be once the house is removed, the contamination could be addressed.' " The argument reiterated, "It's probably not going to be cheaper than the $104,000." Later, plaintiff returned to that theme. "We know, and have a good idea, what it costs to dig up all that soil. We have a pretty good idea of—dig up the soil back in 1993."

### E. Jury Instructions and the Special Verdicts

Some of the jury instructions have already been summarized above in the introduction. The jury was also instructed that the theories of nuisance and trespass involved the elements that a defendant's conduct was a substantial factor in causing harm to plaintiff or her property. Upon finding plaintiff's claims proved, the jury was required to decide how much money would reasonably compensate plaintiff for her harm. Plaintiff claimed two types of damages, economic and noneconomic. The noneconomic damages included the loss of use of the property for three years, annoyance, discomfort, or inconvenience. Economic damages included the cost of expert consulting, but not diminution in property value or future harm. For continuing trespass, damages were the difference in rental value if the property were not contaminated, but not emotional distress.

The jury was also instructed: "A release of contamination means to free the contaminants from a container or containment. If petroleum contamination is already in soil or groundwater due to a past release, it cannot be released again, by later acts of a party who uncovers it."[10]

During deliberations, the jury pointed out a logical error in the verdict forms. The court agreed the form needed to be corrected as the jury suggested and it resumed deliberations.[11] Later that day, on July 20, 2006, the jury found by way of special verdict forms that defendants M. Douglas Gustafson and his corporation, the Tamarind Group, Inc., had caused oil or other petroleum products to be released onto the downhill property, thereby creating a condition that caused harm and interfered with plaintiff's free use and enjoyment of the downhill property.

---

[10] We quote the written instruction proposed by the Finklang defendants. The reporter's transcript has "containments" for "contaminant," an obvious transcription error, and omitted the final "of," which could have been the judge misspeaking.

[11] Question No. 3 in the trespass section initially asked whether plaintiff, her parents, or their tenant had consented to the release of petroleum products on the downhill property. The form then directed the jury to answer question No. 4 if it found consent. Question No. 4 pertained to whether the trespass caused substantial harm. The form was modified to direct the jurors to answer question No. 4 if they found no consent.

As stated above in the introduction, the jury did not proceed to award compensatory damages for nuisance or trespass because the special verdict form told them not to unless they could affirmatively answer that the condition of plaintiff's property could "have been repaired or abated by reasonable means and at a reasonable cost."[12] Of the choices, "yes," "no," and "unknown," the jury selected "unknown," bypassed the remaining questions about damages, and signed the verdict form.

The jury did not initially answer question No. 8 (pertaining to nuisance and trespass) asking whether any defendant who had created a nuisance or committed a trespass had acted with malice, fraud, or oppression.[13] In the jury's absence, the court identified a problem in that the jury had not answered these questions. The Gustafson defendants asserted that the answer to question No. 5 "makes everything else moot," and "[i]f the verdict is no general damages, then there may be no punitive damages without general damages." The court stated: "That may be your argument post trial, but, at this point of the proceeding, I'm giving the jury the form back. I'm sending them in. [¶] I'm letting you know. We're not debating it." The court instructed the jury to continue deliberations. They determined that the Gustafson defendants acted with malice, fraud, or oppression in creating a nuisance, but not by releasing oil. In returning that verdict, the jurors made notes on the verdict form that they discussed with the court. Three jurors stated that they found it confusing that they were required to answer question No. 8 when the form told them they were done if they answered question No. 5 "unknown." One juror said they were no longer confused.

The Gustafson defendants, the only remaining defendants, objected to further proceedings, asserting that "this form is quite correct. I believe the answer 'unknown' to question five is completely dispositive of this case." "I believe the Court made a mistake when it sent them back."

---

[12] More specifically, nuisance question No. 5 asked, "Could the condition have been repaired or abated by reasonable means and at a reasonable cost? [¶] ___ Yes ___ No ___ Unknown [¶] If your answer to Question 5 is yes, then answer Question 6. [¶] If you answered no or unknown, do not answer any further questions regarding nuisance and go on to the form for trespass." Trespass question No. 5 asked, "Could the conditions on the 164 12th Street property have been repaired or abated by reasonable means and at a reasonable cost? [¶] ___ Yes ___ No ___ Unknown [¶] If your answer to Question 5 is yes, then answer Question 6. [¶] If you answered no or unknown, do not answer any further questions, and have the presiding juror sign and date this form."

[13] Question No. 8 in the nuisance section of the special verdict form asked, "If you answered yes as to any defendant in Question 4, did that defendant act with malice, fraud, or oppression?" Question No. 8 in the trespass section of the special verdict form asked, "If you answered yes as to any defendant in Question 2, did that defendant act with malice, fraud or oppression?" Following each question, each of the four remaining defendants were listed.

The court proceeded to a bifurcated trial on the amount of punitive damages. On July 21, 2006, on a separate "verdict form as to punitive damages" (capitalization omitted), the jury awarded punitive damages of $250,000 against M. Douglas Gustafson and $250,000 against the Tamarind Group, Inc.

After the court instructed the jurors that they could now talk to anyone about the case if they wanted to, several jurors had questions for the court. One of them asked, "Besides punitive damages, what else is there?" The court explained the difference between punitive and compensatory damages. The same juror asked, "So we declared the punitive damages; whereas, do you impose the compensatory damages?" The court answered, "No. You also declared . . . unknown . . . in the previous verdict." Another juror said, "We said unknown?" The court stated: "That's right. That is what you said. That verdict has been recorded."[14]

## IV. POSTJUDGMENT RULINGS

On August 4, 2006, the Gustafson defendants filed a motion for judgment notwithstanding the verdict and an order vacating the punitive damages award. Defendants' motion asserted that the "court may not proceed under time-barred causes of action." (Capitalization omitted.) "[O]nce the statute of limitations is found to bar a cause of action, there is no method by which a court may proceed further." "[A]ny damages the jury awarded in reliance on a time-barred cause of action may not stand."

On August 30, 2006, plaintiff filed a motion seeking a new trial either limited to the issue of compensatory damages or on all issues. Plaintiff's written motion asserted in part: "The Court should find that the jury's verdict is 'against law' because the verdict was so inconsistent, ambiguous and uncertain that we are incapable of reconciling how the jury found liability and awarded punitive damages, while failing to find on a material issue, compensatory damages." "Where an inconsistency is identified before the jury is discharged, the court has a duty to order its correction by either advising the jury or sending jurors back for further deliberations. In the liability phase of the trial, the Court identified the inconsistency in the Verdict Form Questions and before discharging the jury ordered its correction by sending the jurors back for further deliberations on Question 8. The judge was completely within his authority and, in fact, had a duty to order the

---

[14] To the extent the court's statement implied that the jury found the amount of compensatory damages to be unknown, this implication was incorrect. What the jury found to be unknown was whether the condition of plaintiff's property could be repaired or abated by reasonable means at a reasonable cost. The verdict form precluded them from assessing compensatory damages after this finding.

correction when the inconsistency was identified. Yet, the verdict was patently inconsistent that jurors found liability and awarded punitive damages without awarding compensatory damages, but the court did not send the jury back for further deliberations. [¶] Plaintiffs [*sic*] raised the issue that Question 5 of the jury instructions were [*sic*] ambiguous, inconsistent, compound, and confusing." The trial court refused plaintiff's suggestions to simply throw out the jury's answer to this question.

On September 29, 2006, plaintiff filed a notice of appeal from the judgment and related prior rulings.

At a hearing on October 19, 2006, the trial court deemed the Gustafson motion to be one seeking a new trial. As quoted in the introduction, the court granted a new trial as to the issues of compensatory damages, punitive damages, and the corporate and individual standing of Gustafson.

On December 18, 2006, plaintiff filed a notice of appeal from the ruling granting a new trial. On December 26, 2006, Gustafson and the Tamarind Group, Inc., filed an appeal from the order denying their motion for a judgment notwithstanding the verdict, and a cross-appeal from the order granting plaintiff's motion for new trial.

## V. The Impact of the Jury's Special Verdict on Abatability

### A. The Denial of Defendants' Motion for Judgment

On appeal, defendants argue that there was no basis for ordering a new trial on the issue of compensatory damages, because the special verdict established that plaintiff is seeking relief for a permanent nuisance and the statute of limitations has lapsed on this cause of action. This is the same argument supporting their motion for a judgment notwithstanding the verdict.[15]

As the California Supreme Court has explained in *Sweatman v. Department of Veterans Affairs* (2001) 25 Cal.4th 62, 68 [104 Cal.Rptr.2d 602, 18 P.3d 29]: "A trial court must render judgment notwithstanding the verdict whenever a motion for a directed verdict for the aggrieved party should have

---

[15] As in *Stillwell v. Salvation Army* (2008) 167 Cal.App.4th 360 [84 Cal.Rptr.3d 111], "The situation this case presents differs from the usual procedural posture in which is trial court is asked to grant JNOV" (judgment notwithstanding the verdict). (*Id.* at p. 375.) The court was asked to grant judgment as a matter of law in favor of defendants consistent with at least one of the special verdicts.

been granted. (Code Civ. Proc., § 629.) A motion for judgment notwithstanding the verdict may be granted only if it appears from the evidence, viewed in the light most favorable to the party securing the verdict, that there is no substantial evidence in support. (*Hauter v. Zogarts* (1975) 14 Cal.3d 104, 110 [120 Cal.Rptr. 681, 534 P.2d 377].) [¶] ▇ The moving party may appeal from the judgment or from the order denying the motion for judgment notwithstanding the verdict, or both. (Code Civ. Proc., § 904.1, subd. (a)(4) [making such an order appealable].) As in the trial court, the standard of review is whether any substantial evidence—contradicted or uncontradicted—supports the jury's conclusion. (*Ibid.*; *Hauter v. Zogarts, supra*, 14 Cal.3d at p. 111.)"

▇ As mentioned in the introduction, California law distinguishes between continuing and permanent nuisances. " 'Whether contamination by toxic waste is a permanent or continuing injury . . . turn[s] on the nature and extent of the contamination.' [Citation.] '[T]he crucial test of the permanency of a trespass or nuisance is whether the trespass or nuisance can be discontinued or abated.' [Citation.]" (*Mangini II, supra*, 12 Cal.4th 1087, 1097, quoting *Mangini v. Aerojet-General Corp.* (1991) 230 Cal.App.3d 1125 [281 Cal.Rptr. 827] (*Mangini I*).) In *Mangini II*, the California Supreme Court adopted the opinion of the appellate court that " 'abatable' means that the nuisance can be remedied at a reasonable cost by reasonable means." (*Mangini II, supra*, 12 Cal.4th at p. 1103.) When a nuisance is continuing, the injured party is entitled to bring a series of successive actions, each seeking damages for new injuries occurring within three years of the filing of the action, which damages do not include decrease in the property's market value. When a nuisance is permanent, the injured party is entitled to claim all current and future damages, but must do so in one action (*Spaulding v. Cameron* (1952) 38 Cal.2d 265, 267–268 [239 P.2d 625]) and plaintiffs must bring suit for permanent nuisance within three years of obtaining notice of the contamination of their property. (*Mangini II, supra*, 12 Cal.4th at pp. 1096, 1103.)

In *Mangini II*, the jury was instructed about the difference between continuing and permanent nuisances and that it was the plaintiffs' burden to prove that the nuisance of which they complained, contamination of their property by solid fuel waste materials, was a continuing nuisance. (*Mangini II, supra*, 12 Cal.4th 1087, 1096–1097.) "The jury was also instructed that 'abatable' meant that the contamination could be removed without unreasonable hardship and expense." (*Id.* at p. 1097.) The jury found the existence of a continuing nuisance and awarded damages of $13,232,000. (*Id.* at pp. 1093–1094.) The California Supreme Court upheld the conclusion of the Court of Appeal that the trial court should have granted the defendant's motion for judgment notwithstanding the verdict. (*Id.* at p. 1090.)

In *Mangini II, supra*, 12 Cal.4th 1087, "Plaintiffs' attorney conceded these uncertainties in the cost of cleanup in his closing remarks to the jury: '[N]obody really knows how much is there, where it is, what the chemicals are, or how much it's going to cost to abate the chemicals,' he stated. 'So I guess the bottom line, if you ask yourself the question, how bad really is this site, the answer's got to be you just don't know.' " (*Id.* at p. 1095.)

The court observed: "As we have recounted, plaintiffs freely admit the absence of evidence to show the extent of the contamination. [¶] The result of the uncertainty regarding the extent of contamination is that it is uncertain whether the nuisance is abatable. Thus, we do not know how much land or water has to be decontaminated. We do not know how deep the decontamination would have to go. We have no idea how much it would cost but know only that it would cost unascertainable millions of dollars. [¶] On this record, there is no substantial evidence that the nuisance is abatable." (*Mangini II, supra*, 12 Cal.4th at p. 1103.) Since the nuisance was permanent, the plaintiffs' lawsuit, filed in January 1988, was barred by the statute of limitations, as they were aware at least by 1984 of the contamination of their property. (*Id.* at p. 1096.) "Because, as the Court of Appeal put it, plaintiffs' proof established that 'no one knows how bad the contamination is or how to remedy it,' it followed that plaintiffs had failed to present substantial evidence that the contamination was capable of being abated *at a reasonable cost*. And because the answer to the question whether a particular nuisance is continuing or permanent is whether it is 'abatable'—reasonable cost being a component of 'abatability'—plaintiffs had failed to make their case. It followed that their claims for damages were barred by the three-year statute of limitations prescribed by Code of Civil Procedure section 338, subdivision (b) . . . ." (*Id.* at pp. 1095–1096.)

■ We note that the holding of *Mangini II* is narrow. It was not that soil and groundwater contamination from migrating hydrocarbons is inherently a permanent and not a continuing nuisance. It was simply that when the plaintiff fails to prove such contamination is reasonably abatable, it may be deemed a permanent nuisance. This narrow holding suggests that, had the plaintiffs in *Mangini II* been able to prove reasonable abatability, the nuisance would have been regarded as continuing. For purposes of our analysis, we will assume, without deciding, that the ongoing migration of contamination released into the soil long ago may be a continuing nuisance when there is evidence that it is reasonably abatable.

In our case, special verdict question No. 5 focused the jury's attention on what *Mangini II* identified as the distinguishing criterion between a permanent and a temporary nuisance, namely whether the condition of plaintiff's property could "have been repaired or abated by reasonable means and at a

reasonable cost." The jury's conclusion that it was unknown whether the soil contamination could be abated by reasonable means at a reasonable cost means that plaintiff had failed to prove her claims of continuing nuisance and trespass.

On appeal, plaintiff seeks to distinguish *Mangini II* on the basis that "there was evidence presented on the reasonableness of abatement." She "also provided evidence of the costs of abatement."

Regarding those costs, in her reply brief Attorney Clack characterized the DMC Construction estimate for excavation of the downhill property as of "critical importance to evidence of cost of abatement." She acknowledged that the costs in that estimate were excluded from evidence. Indeed, that is one of her claims of error on appeal.

However, later in the brief, Clack asserts, referencing her own quotation of the estimate during the motions in limine hearing, "McCoy's experts offered expert testimony of soil quantity to be removed, '800 cubic yards . . .' . . . to a 'depth of 10 foot [*sic*] below grade' . . . 'to approximately 6 feet below grade at the base of the retaining wall, resulting in 120 cubic yards of soil being removed'." In this statement, Clack seems to be suggesting that this estimate was before the jury. However, later on the same page of her brief, plaintiff concedes that the jury did not see this cost estimate. She asserts that she "introduced evidence of other costs, if not the cost of the estimate for excavation prepared for Polvado by DMC Construction." Here she refers to the costs mentioned in her argument to the jury, including the projected charges of $8,740 by Burns for reviewing the remedial plans submitted to the Water Board, inspecting the area, and reviewing the remedial work, the projected charges of $20,500 by Salem Engineering for its part in replacing the retaining wall, and Gustafson's costs in 1993 of $104,185.52 for excavating the adjoining property.

This argument is simply argument. There was no expert testimony that the charges for excavation were the same at trial in 2006 as they were in 1993. There was no expert testimony describing or even estimating how wide or deep the contamination on the downhill property was or how much soil would have to be excavated. There was no expert testimony about the costs of lifting the house on the property, excavating the soil underneath it, backfilling the soil, and replacing the house. There was no expert testimony about how much it would cost to completely prevent further migration of oil from the laundry property. "Abatable" for these purposes does not mean by any conceivable means at any cost, but by reasonable means at a reasonable cost.

Clack admitted during the motions in limine hearing that plaintiff's experts were not hired to estimate the cost of remediating the downhill property. It is not surprising that they did not testify at trial about what the cost would be, let alone whether it would be reasonable. As defendants argue, "There was simply no admissible evidence of either the scope of a remediation plan or of the cost of such a plan, let alone any judgment from someone capable of making such judgments of whether such a plan and its cost would be reasonable." The jury reached the unavoidable conclusion based on this failure of proof that it was unknown whether the contamination of the soil on the downhill property could be abated by reasonable means at a reasonable cost.

Plaintiff argues that the nuisance was abatable under other cases that were unconcerned with the cost of abatement. *Baker v. Burbank-Glendale-Pasadena Airport Authority* (1985) 39 Cal.3d 862 [218 Cal.Rptr. 293, 705 P.2d 866] (*Baker*) was a case that arose on demurrer. One of the issues on appeal was whether noise and vibrations from the operations of an airport amounted to a permanent or continuing nuisance. In analyzing the issue, the court stated: "we should be particularly cautious not to enlarge the category of permanent nuisances beyond those structures or conditions that truly are permanent. Where some means of abatement exists, there is little or no incentive to make remedial efforts once the nuisance is classified as permanent. Such a result is at odds with tort law's philosophy of encouraging innovation and repair to decrease future harm." (*Id.* at p. 872.)[16] In *Baker*, the court concluded: "Airport operations are the quintessential continuing nuisance. Although federal law precluding interference in any way with flight patterns and schedules adds an element of permanency to an otherwise continuing problem, it does not mandate that the overall nuisance is a permanent one. Thus plaintiffs may elect whether to treat airport noise and vibrations as a continuing or as a permanent nuisance." (39 Cal.3d at p. 873.)

■ We can add nothing to the thorough analysis of *Baker* by *Mangini II*, *supra*, 12 Cal.4th at pages 1101–1102: "It is true *Baker* referred to the nuisance as a continuing nuisance without regard for the cost of abatement. However, in *Mangini I*, we said we did not read *Baker* as deviating from the rule that abatability determines the character of the nuisance, because in *Baker* the ability to discontinue the nuisance was implied in the court's discussion that the airport was obligated by statute to curb noise pollution. (*Mangini I, supra*, 230 Cal.App.3d at p. 1146.) We also pointed out the debate in *Baker* related to the question whether injunctive relief must be available in order for a nuisance to be abatable. (*Mangini I, supra*, 230 Cal.App.3d at p. 1146.) We said no such issue was present in this case. (*Ibid.*)

---

[16] This passage was quoted in *Mangini II, supra*, 12 Cal.4th 1087 on page 1104 in footnote 5.

Here, the abatability of the contamination presented a question of fact. (*Id.* at p. 1148.) Where abatability is a question of fact, cost is an appropriate factor to consider. Thus, *Baker* does not stand for the proposition that the contamination in this case was abatable regardless of the cost of decontamination."

*Starrh & Starrh Cotton Growers v. Aera Energy LLC* (2007) 153 Cal.App.4th 583 [63 Cal.Rptr.3d 165] (*Starrh*) is a decision we have some trouble understanding. In that case, a jury awarded damages of $3.8 million for a continuing subsurface trespass "resulting from the migration of wastewater produce from oil production activities" in aquifers underlying farmland. (*Id.* at p. 588.) Granting a partial directed verdict, "[t]he trial court found Aera's trespass to be continuing because Aera persists in disposing of produced water into its unlined ponding basins. As a result, produced water continues to migrate onto Starrh's ·property and degrade the quality of its underlying aquifers." (*Id.* at p. 598.)

On appeal, the defendant argued that its trespass was permanent and the cause of action was time-barred. (*Starrh, supra*, 153 Cal.App.4th at p. 589.) In *Starrh*, the Fifth District Court of Appeal quoted a secondary source as saying that California law has three different tests for determining whether a nuisance is abatable, namely: " '[W]hether (1) the offense [*sic*] activity is currently continuing, which indicates that the nuisance is continuing, (2) the impact of the condition will vary over time, indicating a continuing nuisance, or (3) the nuisance can be abated at any time, in a reasonable manner and for a reasonable cost, and is feasible by comparison of the benefits and detriments to be gained by abatement.' " (*Id.* at p. 594.)

*Starrh* distinguished *Mangini II* in that there "the harmful activity had stopped long ago and there was no evidence the impact of the toxic materials would vary over time. Therefore, only the last of the available tests for characterizing the nuisance as continuing was available to defeat the statute-of-limitations defense." (*Starrh, supra*, 153 Cal.App.4th at p. 595.)[17] In contrast, in *Starrh* "the offensive activity continues and the impact of the

---

[17] This is a disingenuous distinction. Nowhere in *Mangini II* did the Supreme Court acknowledge either the existence of three different tests of abatability or that it was selecting the only one factually applicable.

We acknowledge there is other case authority recognizing different tests of abatability. In *Beck Development Co. v. Southern Pacific Transportation Co.* (1996) 44 Cal.App.4th 1160 [52 Cal.Rptr.2d 518] (*Beck*), the Third District Court of Appeal identified alternative tests for nuisance on pages 1218 and 1219: "[S]ome courts have found that contamination may be shown to be a continuing nuisance by evidence that the contaminants continue to migrate through land and groundwater causing new and additional damage on a continuous basis. (See *Newhall Land & Farming Co. v. Superior Court* (1993) 19 Cal.App.4th 334, 341 [23 Cal.Rptr.2d 377]; *Capogeannis v. Superior Court* [(1993)] 12 Cal.App.4th [668,] 673, 681 [15 Cal.Rptr.2d 796]; *Arcade Water Dist. v. U.S.* (9th Cir. 1991) 940 F.2d 1265, 1268 ['In determining under California law whether the nuisance is continuing, the most salient

subsurface migration will worsen as time passes . . . ." (153 Cal.App.4th at p. 595.) Because the offensive activity of ponding wastewater in *Starrh* was continuing, the court found that the first two tests were available and pointed "toward a conclusion that Aera's ponding practices establish a continuing trespass onto Starrh's property." (*Ibid.*)

*Starrh* considered its situation closer to *Baker* than *Mangini II*. "Although the airport could not reasonably be shut down, it was possible to abate in some manner the noise and vibration caused by the flights over the plaintiff's [*sic*] home and, under *Baker*, those options had to be explored." (*Starrh, supra*, 153 Cal.App.4th at p. 596.) Similarly, the harm in *Starrh* "can be abated *by some means*." (*Ibid.*) "Aera officials testified they would continue the ponding practices for economic reasons as long as they were allowed to do so, but admitted other methods of disposal were available at a higher cost." (*Id.* at p. 597.) "The evidence indisputably establishes that alternative, although more expensive, methods of disposal were available to Aera." (*Id.* at p. 605.)

*Starrh* concluded: "In our view, this case presents a classic continuing trespass situation. Our conclusion is consistent with *Mangini* [*II*], which warned that courts should be cautious not to enlarge the category of permanent nuisance beyond those structures or conditions that truly are permanent. It stressed that, where some means of abatement exist, classifying the trespass or nuisance as permanent will discourage remedial efforts." (*Starrh, supra*, 153 Cal.App.4th at p. 597, citing *Mangini II, supra*, 12 Cal.4th at p. 1104 [without referencing the applicable footnote].)

*Starrh* went on to discuss the measure of damages and emphasized that "abatement is simply another word for restoration. In order to abate or restore the subsurface trespass, the contamination must be cleaned up. Starrh may recover the costs of restoration as a statutory measure of damages [under Civil Code section 3334, subdivision (a)] *only* if cleaning up the contamination is possible or economically practical." (*Starrh, supra*, 153 Cal.App.4th at p. 599.) The court agreed with the appellant "that there is no record evidence to support the jury's $3.8 million award for restoration costs." (*Id.* at p. 600.) "The evidence of unreasonableness in this case is sufficiently strong that we are tempted to conclude that the project is unreasonable as a matter of law." (*Id.* at p. 601.) One expert had estimated the cost at over $2 billion. (*Ibid.*)

---

allegation is that contamination continues to leach into Arcade's Well 31.'].)" On the other hand, "the test most often stated in contamination cases . . . is . . . whether the nuisance can be abated at any time." (*Beck, supra*, 44 Cal.App.4th at p. 1219.) After reviewing this precedent, the court in *Beck* finally acknowledged the refinement of the reasonably abatable test adopted in *Mangini II* (*id.* at pp. 1220–1221), an opinion filed just 20 days before the 63-page opinion in *Beck*.

Ultimately, considering the issue of reasonableness to be a factual issue, the court reversed the judgment for a new trial on the issue of damages so that the jury could be properly instructed about how to determine this issue. (*Id.* at pp. 600–602.) "[A] jury must be told that once it resolves the factual issue of how much it might cost to restore the groundwater under Starrh's property to its original state (resolving the evidence presented by the experts), it must then determine whether the restoration costs are reasonable in light of all the competing interests." (*Id.* at p. 601.) "[T]he jury needs to be advised that it can deny damages if it concludes the restoration costs are unreasonable." (*Id.* at p. 602.)

There is language in *Starrh* suggesting that a trespass is considered abatable and continuing if it "can be abated *by some means.*" (*Starrh, supra,* 153 Cal.App.4th at p. 596.) As *Mangini II* stated about *Baker, Starrh* cannot be understood as supporting the proposition that the contamination was abatable regardless of the cost of decontamination. To the extent it does support that proposition, we consider it to be inconsistent with *Mangini II.* We are perplexed by the appellate court's ability to classify the trespass as continuing when it considered the proposed restoration cost of $2 billion to be almost unreasonable as a matter of law. Ultimately, the appellate court reversed the jury award so that the jury could be properly presented with the issue whether there was some amount of damages that would be reasonable.

█ In our case, the jury has already been asked to consider whether the condition of plaintiff's property could be repaired or abated at a reasonable cost by reasonable means. That the answer was "unknown" established that the nuisance and trespass must be considered permanent under *Mangini II.*

Under these circumstances, as in *Mangini II,* the court should have granted defendants' motion for judgment notwithstanding the verdict, as there was no substantial evidence that the nuisance and trespass, of which Margaret McCoy first complained in 1986, are other than permanent. Therefore, plaintiff's claims of nuisance and trespass, filed in 2002, are time-barred.

In light of this conclusion, we need not and do not reach defendants' other contentions in their cross-appeal, namely that plaintiff cannot be awarded punitive damages without being awarded compensatory damages and that the punitive damages award is unconstitutionally disproportionate to the compensatory damages award.

B. *The Grant of Plaintiff's Motion for a New Trial*

Plaintiff argues that the trial court properly denied defendant's motion for judgment notwithstanding the verdict and granted a new trial on compensatory damages based on the confusing nature of the special verdict forms.

■ *Zagami, Inc. v. James A. Crone, Inc.* (2008) 160 Cal.App.4th 1083 [74 Cal.Rptr.3d 235] provides a thorough review of relevant law at pages 1091 and 1092: "*Woodcock* [*v. Fontana Scaffolding & Equip. Co.* (1968) 69 Cal.2d 452 [72 Cal.Rptr. 217, 445 P.2d 881]] thus recognizes a multilayered approach in dealing with a potentially defective special verdict. If the jury has not been discharged, the trial judge should request the jury to correct or clarify a potentially ambiguous or inconsistent verdict. (*Woodcock, supra,* 69 Cal.2d at p. 456; see also Code Civ. Proc., § 619[18]; *Mendoza v. Club Car, Inc.* (2000) 81 Cal.App.4th 287, 303 [96 Cal.Rptr.2d 605] (*Mendoza*) [trial judge may be obligated to require the jury to correct or clarify a potentially ambiguous verdict, and its refusal to do so may be an abuse of discretion]; *Van Damme v. McGilvray Stone Co.* (1913) 22 Cal.App. 191 [133 P. 995] [when the court's attention is called to an improper verdict, it is the court's duty to instruct the jury further upon the subject of the legal limitation of the verdict under consideration].) A court's instruction to the jury to deliberate further to correct a potentially ambiguous or inconsistent verdict is reviewed for abuse of discretion. (*Maxwell v. Powers* (1994) 22 Cal.App.4th 1596, 1603–1604 [28 Cal.Rptr.2d 62].) However, a special verdict's correctness is analyzed as a matter of law and therefore subject to de novo review. (*Mendoza, supra,* at p. 303.)

"If the jury has been discharged and the verdict is 'hopelessly ambiguous,' the judgment must be reversed. (*Woodcock, supra,* 69 Cal.2d at p. 457; see *City of San Diego v. D.R. Horton San Diego Holding Co., Inc.* (2005) 126 Cal.App.4th 668, 682 [24 Cal.Rptr.3d 338] (*Horton*).)[19] A court reviewing a special verdict does not infer findings in favor of the prevailing party (*Trujillo v. North County Transit Dist.* (1998) 63 Cal.App.4th 280, 285 [73 Cal.Rptr.2d 596]), and there is no presumption in favor of upholding a special verdict when the inconsistency is between two questions in a special verdict. (*Mendoza, supra,* 81 Cal.App.4th at pp. 302–303.) 'Where there is an inconsistency between or among answers within a special verdict, both or all the questions are equally against the law.' (*Horton, supra,* at p. 682; see *Shaw v. Hughes Aircraft Co.* (2000) 83 Cal.App.4th 1336, 1344 [100 Cal.Rptr.2d 446]; *Morris v. McCauley's Quality Transmission Service* (1976)

---

[18] Footnote 4 of *Zagami, Inc.*, states: "Code of Civil Procedure section 619 states, 'When the verdict is announced, if it is informal or insufficient, in not covering the issue submitted, it may be corrected by the jury under the advice of the Court, or the jury may be again sent out.' "

[19] Footnote 5 of *Zagami, Inc.*, states: "If the verdict is merely ambiguous, a party's failure to request a correction or clarification of the verdict before the jury is discharged may amount to a waiver of the ambiguity or defect, particularly if the party's failure to object was to reap a ' "technical advantage" ' or to engage in a ' "litigious strategy." ' (*Woodcock, supra,* 69 Cal.2d at p. 457, fn. 2; see *Henrioulle v. Marin Ventures, Inc.* (1978) 20 Cal.3d 512, 521–522 [143 Cal.Rptr. 247, 573 P.2d 465]; *Jensen v. BMW of North America, Inc.* (1995) 35 Cal.App.4th 112, 131 [41 Cal.Rptr.2d 295].)"

60 Cal.App.3d 964, 973 [132 Cal.Rptr. 37].) 'The appellate court is not permitted to choose between inconsistent answers.' (*Horton, supra*, at p. 682.) In those instances, however, retrial may be limited to the issue of damages. (*Woodcock, supra*, at p. 457; *Aynes v. Winans* (1948) 33 Cal.2d 206, 210 [200 P.2d 533]; *Mixon v. Riverview Hospital* (1967) 254 Cal.App.2d 364, 380 [62 Cal.Rptr. 379]; *West v. Duncan* (1962) 205 Cal.App.2d 140, 144 [22 Cal.Rptr. 833]; *Shell v. Schmidt* (1954) 126 Cal.App.2d 279, 294 [272 P.2d 82].)

"If a verdict is not 'hopelessly ambiguous,' the court may ' "interpret the verdict from its language considered in connection with the pleadings, evidence and instructions." ' (*Woodcock, supra*, 69 Cal.2d at pp. 457, 456; see *All-West Design, Inc. v. Boozer* (1986) 183 Cal.App.3d 1212, 1223–1224 [228 Cal.Rptr. 736]; *Clark v. McClurg* (1932) 215 Cal. 279, 285 [9 P.2d 505]; 7 Witkin, Cal. Procedure (4th ed. 1997) Trial, § 375, p. 427.)" (Fns. omitted.)

" 'Where the trial judge does not interpret the verdict or interprets it erroneously, an appellate court will interpret the verdict if it is possible to give a correct interpretation.' " (*Zagami, Inc. v. James A. Crone, Inc., supra*, 160 Cal.App.4th at p. 1091, quoting *Woodcock v. Fontana Scaffolding & Equip. Co., supra*, 69 Cal.2d at p. 457.)

■ On appeal, plaintiff asserts that the jury was confused by the special verdict form. From our perspective, the trial court was more confused than the jury. The verdict form required the jury to determine whether the nuisance and trespass could "have been repaired or abated by reasonable means and at a reasonable cost." Under *Mangini II*, this is the factual predicate necessary to concluding that the nuisance and trespass were continuing and not barred by the statute of limitations. *Starrh* stated: "Generally, whether a trespass is continuing or permanent is a question of fact properly submitted to the jury. [Citation.] A trial court may remove the issue of fact from the jury by directed verdict only if there is no evidence tending to prove the case of the party opposing the motion." (*Starrh, supra*, 153 Cal.App.4th 583, 597; cf. *Shamsian v. Atlantic Richfield Co.* (2003) 107 Cal.App.4th 967, 980 [132 Cal.Rptr.2d 635].) ■ The defense of the statute of limitations may be tried in advance of other issues in the case. (§ 597.) In this case it was not.

■ The difference between general and special verdicts is: "A general verdict is that by which they pronounce generally upon all or any of the issues, either in favor of the plaintiff or defendant; a special verdict is that by which the jury find the facts only, leaving the judgment to the Court. The special verdict must present the conclusions of fact as established by the evidence, and not the evidence to prove them; and those conclusions of fact must be so presented as that nothing shall remain to the Court but to draw

from them conclusions of law." (§ 624.) Under this statutory scheme, in a special verdict the jury finds the facts and leaves the legal conclusions to the trial court.[20] (See *Electronic Equipment Express, Inc. v. Donald H. Seiler & Co.* (1981) 122 Cal.App.3d 834, 854 [176 Cal.Rptr. 239] [harmless error under the circumstances to inform jury of the consequences of their determinations on statute of limitations questions].)

As in *Mangini II*, when the evidence is that no one knows how bad the contamination is or how to remedy it, the plaintiff has failed to "present substantial evidence that the contamination was capable of being abated *at a reasonable cost.*" (*Mangini II, supra*, 12 Cal.4th 1087, 1095–1096.) Since plaintiff failed to prove a continuing nuisance when the contamination was discovered more than three years prior to the filing of the complaint, her action is barred by the statute of limitations. Accordingly, the jury in this case was properly directed by the verdict form not to find either the amount of compensatory damages or the factual predicate for punitive damages. The malice, fraud, or oppression findings were the final questions in the series, meant to be bypassed if the predicate for the statute of limitations was established.

We acknowledge that question No. 8 in the nuisance section, which the jury eventually answered "yes," could have been better drafted. Instead of asking—"If you answered yes as to any defendant in Question 4, did that defendant act with malice, fraud or oppression?"—it should have asked "If you answered yes as to any defendant in Question 4, and you awarded plaintiff damages in Question 6, did that defendant act with malice, fraud or oppression?" But we consider it reasonably implicit in the special verdict form that question No. 8 should not have been answered unless the jury found the contamination of plaintiff's property to be reasonably abatable.

In this case, the finding that defendants acted with malice, fraud, or oppression is not inconsistent with the special verdict on question No. 5. The intentional nature of defendants' conduct in trespassing or creating a nuisance is not relevant under *Mangini II* to whether the trespass or nuisance is reasonably abatable or permanent. It was not until the trial court asked the jury whether to award punitive damages that apparently inconsistent verdicts were created.

"We analyze the special verdict form de novo." (*Saxena v. Goffney* (2008) 159 Cal.App.4th 316, 325 [71 Cal.Rptr.3d 469].) We disagree with the trial

---

[20] At the hearing on the posttrial motions, the trial court correctly observed that the jury was not specifically asked to find whether there was a permanent nuisance. Mark Hudak, attorney for the Finklang defendants, was the one who drafted the verdict form. He asserted that he intended to tailor question No. 5 to the key characteristic of a permanent nuisance identified in *Mangini II*.

court's conclusion "that the verdict form was unfortunately hopelessly mired in confusion and ambiguity." We find no hopeless ambiguity or irreconcilable inconsistency in the jury's verdicts. There is no logical or legal inconsistency in finding it to be the case that a defendant has committed a malicious tort injuring a plaintiff and that the plaintiff should have filed a lawsuit for that tort sooner. The jury's special verdict found the facts establishing the statute of limitations defense. That the trial court did not correctly interpret this verdict and draw the necessary legal conclusion does not establish that the jury was confused by the special verdict form. The jurors were confused by the trial court's requiring them to deliberate further, in apparent disregard of the special verdict form instructions, but that does not necessarily demonstrate ambiguity in the form. The verdict form asking an assessment of punitive damages was not part of the form originally submitted to the jury during the first stage of the bifurcated trial.

Plaintiff further asserts that question No. 5 (fn. 12, *ante*) is "compound, confusing and ambiguous." We disagree. The language is taken almost verbatim from *Mangini II*, with a substitution of "repaired or abated" for "remedied" and an inversion of the order of "reasonable means" and "reasonable costs." We recognize that there is a danger in basing jury instructions on language taken out of context from appellate opinions that was not specifically crafted to serve as a jury instruction. (*Bay Summit Community Assn. v. Shell Oil Co.* (1996) 51 Cal.App.4th 762, 778 [59 Cal.Rptr.2d 322]; *Fierro v. International Harvester Co.* (1982) 127 Cal.App.3d 862, 867–868 [179 Cal.Rptr. 923].) But, as already indicated, we believe that this question accurately focused the jury's attention on the existence of a prerequisite component of a continuing nuisance and trespass.

Since we conclude that the verdict form was not infected with hopeless ambiguity and confusion, it follows that the trial court erred in granting a new trial on this basis. "Although generally a new trial order will be affirmed if it should have been granted on any ground stated in the notice of intention [citation], where 'a trial court in granting a new trial based its order exclusively upon an erroneous concept of legal principles applicable to the cause, its order will be reversed [citation].' (*Conner v. Southern Pacific Co.* (1952) 38 Cal.2d 633, 637 [241 P.2d 535].)" (*Neal v. Montgomery Elevator Co.* (1992) 7 Cal.App.4th 1194, 1199–1200 [9 Cal.Rptr.2d 497].)

In light of this conclusion, we do not reach plaintiff's argument that the trial court erred by allowing a new trial on the issue of Gustafson's standing.

## VI. Was Plaintiff's Failure of Proof Attributable to Judicial Error

Anticipating our conclusion that the trial court should have granted a judgment for defendants notwithstanding the verdict, plaintiff makes several arguments to establish that, if she failed to present evidence at trial that the contamination was reasonably abatable, it was because the trial court and defense counsel had wrongly tied her hands.

### A. Limitations on Expert Testimony

Plaintiff asks us to "reverse the exclusion of evidence of percipient lay or expert witnesses with instructions to allow Plaintiff['s] expert Dr. Liu to testify to his own work product whether or not designated as an expert." She suggests "he could have testified about contamination reports and abatement requirements that he required." She also asks us to "reverse with instructions to allow the continued deposition of expert Polvado because there would neither be undue trial delay" nor prejudice to defendants. The trial court excluded each of these items of evidence based on its understanding of the limitations on the scope of expert testimony in a civil case. As we will explain, the challenged rulings were grounded on existing law.

*Greyhound Corp. v. Superior Court* (1961) 56 Cal.2d 355 [15 Cal.Rptr. 90, 364 P.2d 266] identified several objectives of California's then modern discovery statutes: "(1) to give greater assistance to the parties in ascertaining the truth and in checking and preventing perjury; (2) to provide an effective means of detecting and exposing false, fraudulent and sham claims and defenses; (3) to make available, in a simple, convenient and inexpensive way, facts which otherwise could not be proved except with great difficulty; (4) to educate the parties in advance of trial as to the real value of their claims and defenses, thereby encouraging settlements; (5) to expedite litigation; (6) to safeguard against surprise; (7) to prevent delay; (8) to simplify and narrow the issues; and, (9) to expedite and facilitate both preparation and trial. [¶] Certainly, it can be said, that the Legislature intended to take the 'game' element out of trial preparation while yet retaining the adversary nature of the trial itself. One of the principal purposes of discovery was to do away 'with the sporting theory of litigation—namely, surprise at the trial.' " (*Id.* at p. 376, fn. omitted.)

Currently, the Code of Civil Procedure contains elaborate provisions for the discovery and exchange of expert witness information prior to civil trial in part 4, title 4, chapter 18. (§§ 2034.010–2034.730.) The California Supreme Court has explained in *Bonds v. Roy* (1999) 20 Cal.4th 140, 146–147 [83 Cal.Rptr.2d 289, 973 P.2d 66], on which defendants rely: "[T]he very

purpose of the expert witness discovery statute is to give fair notice of what an expert will say at trial. This allows the parties to assess whether to take the expert's deposition, to fully explore the relevant subject area at any such deposition, and to select an expert who can respond with a competing opinion on that subject area. 'The opportunity to depose an expert during trial, particularly if the testimony relates to a central issue, often provides a wholly inadequate opportunity to understand the expert's opinion and to prepare to meet it. [Citations.]' (Kennedy & Martin, Cal. Expert Witness Guide [(Cont.Ed.Bar 1998)] § 10.18, at p. 267.) '[T]he need for pretrial discovery is greater with respect to expert witnesses than it is for ordinary fact witnesses [because] . . . [¶] . . . the other parties must prepare to cope with witnesses possessed of specialized knowledge in some scientific or technical field. They must gear up to cross-examine them effectively, and they must marshal the evidence to rebut their opinions.' (1 Hogan & Weber, Cal. Civil Discovery (1997) Expert Witness Disclosure § 10.1, p. 525.) 'Late disclosure of experts . . . frustrates the very purposes of the discovery statutes, and should be permitted, with appropriate safeguards and limits, only when absolutely necessary to avoid a miscarriage of justice.' (Kennedy & Martin, Cal. Expert Witness Guide, *supra*, § 10.18, at p. 268.)"

The court continued: "[T]he statutory scheme as a whole envisions timely disclosure of the general substance of an expert's expected testimony so that the parties may properly prepare for trial. Allowing new and unexpected testimony for the first time at trial so long as a party has submitted any expert witness declaration whatsoever is inconsistent with this purpose." (*Bonds v. Roy, supra*, 20 Cal.4th 140, 148.)

### 1. *Witness Polvado*

As to plaintiff's expert Polvado, at the time of his deposition on June 8, 2006, he had not seen the May 26, 2006 estimate prepared by DMC Construction, he admitted having no input into the proposed amounts of soil to be removed, and he was not asked to offer an opinion about the reasonableness of the estimate.[21] Under these circumstances, on June 28, 2006, the Finklang defendants moved to preclude Polvado from offering any opinion about the cost of remediation.

It was reasonable for the court to grant this motion in part. In *Amtower v. Photon Dynamics, Inc.* (2008) 158 Cal.App.4th 1582 [71 Cal.Rptr.3d 361], this court observed, "The trial court properly prohibited any opinions relating to the fraud causes of action since Scott had testified at his deposition that he

---

[21] Clack misleadingly asserts that Polvado discussed the various excavation estimates by DMC at his deposition. The cited quotations reveal that he discussed them only to say he had no input into any of them.

had formed no opinions on those causes of action. (*Jones v. Moore* (2000) 80 Cal.App.4th 557, 564–565 [95 Cal.Rptr.2d 216] [trial court may exclude expert opinion that goes beyond the opinions expressed at deposition].)" (*Id.* at p. 1599.)

Plaintiff sought to avoid this limitation by offering to continue Polvado's deposition. With trial set for June 27, 2006, at the motions in limine hearing on June 28, 2006, Clack offered to have Polvado's deposition continued so that he could review the DMC estimate and offer an opinion about it.

■ Since the deposition was over, Clack was not actually seeking a continuance, but a subsequent deposition of Polvado. The statute prohibits taking a subsequent deposition of a person (§ 2025.610, subd. (a)), unless the parties and the deponent agree to one or the court grants leave to take a subsequent deposition "for good cause shown" (*id.*, subd. (b)).

■ There are also statutory time limits for the completion of discovery regarding expert witnesses. "Any party shall be entitled as a matter of right to complete discovery proceedings pertaining to a witness identified under Chapter 18 (commencing with Section 2034.010) on or before the 15th day, and to have motions concerning that discovery heard on or before the 10th day, before the date initially set for the trial of the action." (§ 2024.030.) Discovery can be reopened on motion by any party for good reasons when it is necessary, the party seeking further discovery has been diligent, and there will be neither prejudice to the opponent nor impact on the scheduled trial date. (§ 2024.050.)[22]

---

[22] Section 2024.050 provides in part: "(a) On motion of any party, the court may grant leave to complete discovery proceedings, or to have a motion concerning discovery heard, closer to the initial trial date, or to reopen discovery after a new trial date has been set. This motion shall be accompanied by a meet and confer declaration under Section 2016.040.

"(b) In exercising its discretion to grant or deny this motion, the court shall take into consideration any matter relevant to the leave requested, including, but not limited to, the following:

"(1) The necessity and the reasons for the discovery.

"(2) The diligence or lack of diligence of the party seeking the discovery or the hearing of a discovery motion, and the reasons that the discovery was not completed or that the discovery motion was not heard earlier.

"(3) Any likelihood that permitting the discovery or hearing the discovery motion will prevent the case from going to trial on the date set, or otherwise interfere with the trial calendar, or result in prejudice to any other party.

"(4) The length of time that has elapsed between any date previously set, and the date presently set, for the trial of the action."

Plaintiff seeks to blame defendants for her expert's having no opinion at his deposition about what remediation was required and what would be reasonable. "It is Defendant[']s burden to ask the questions. Defendants chose not to ask Polvado about the cost. Defendants never asked the question about 'reasonableness.' "

Plaintiff appears to misunderstand civil discovery. If plaintiff's designation of experts[23] had identified Polvado as prepared to offer an opinion on the cost and reasonableness of a plan to abate the contamination on the downhill property, defendants would have had an opportunity to decide whether to discover this opinion by way of deposition before trial and would not have been able to claim surprise at trial had they failed to avail themselves of this discovery mechanism. (See *In re Marriage of Hoffmeister* (1984) 161 Cal.App.3d 1163, 1171, fn. 6 [208 Cal.Rptr. 345]; *Schreiber v. Estate of Kiser* (1999) 22 Cal.4th 31, 39 [91 Cal.Rptr.2d 293, 989 P.2d 720].) In this case, defendants asked sufficient questions at Polvado's deposition to establish that he had no idea how much soil needed to be excavated from the downhill property and he had no input into the excavation estimates by DMC Construction. They were not required to prod him to develop opinions he did not have prior to his deposition.

In this case, it appears that plaintiff's expert witnesses were not prepared to offer opinions about whether the condition of plaintiff's property could be reasonably abated because plaintiff did not appreciate the significance of this prerequisite prior to trial and because plaintiff was trying to economize in what she required of her experts. During the motions in limine hearing, Clack offered Polvado for a second deposition because he was "flustered" at his deposition. As the trial court observed, this is not a good reason to authorize a subsequent deposition. We see no demonstration of diligence by plaintiff warranting a reopening of discovery for her expert Polvado to develop a new opinion on the eve of trial. We find no abuse of discretion in the trial court implicitly denying this request. It was reasonable for the trial court to preclude plaintiff's experts from offering opinions at trial that they had not given at their depositions, particularly as to the cost and reasonableness of a plan for remediating the downhill property. (Compare *Bonds v. Roy, supra*, 20 Cal.4th 140, 149 [no abuse of discretion in trial court limiting defense expert to the general substance described in his expert witness declaration when defendant had not sought to amend the declaration as provided by statute] with *Easterby v. Clark* (2009) 171 Cal.App.4th 772, 780–781 [90 Cal.Rptr.3d 81] [expert's opinion at trial may differ from deposition opinion if party gives opponent reasonable notice of change in testimony and opponent has fair opportunity for a second deposition before trial].)

[23] An expert designation must include a "brief narrative statement of the general substance of the testimony that the expert is expected to give." (§ 2034.260, subd. (c)(2).)

### 2. *Witness Liu*

Dr. Wei Liu was an employee of the Water Board involved in drafting letters to Gustafson about what he needed to do to study and then abate the contamination on the downhill property. Although he was not designated as an expert, Attorney Clack expected that Liu would be able to read the contents of the agency's letters into evidence, or, at a minimum, at least provide his own opinions about what abatement efforts were required.

Plaintiff asserts that "experts are allowed to testify to their own work product." Citing *Province v. Center for Women's Health & Family Birth* (1993) 20 Cal.App.4th 1673 [25 Cal.Rptr.2d 667] (*Province*), disapproved on other grounds in *Heller v. Norcal Mutual Ins. Co.* (1994) 8 Cal.4th 30, 41 [32 Cal.Rptr.2d 200, 876 P.2d 999], plaintiff asserts that "unlisted experts may be permitted to testify regarding their percipient observations . . . ."

▇ In *Province*, the appellate court concluded that the trial court had erred in allowing a pathologist to testify who had not been designated as an expert. While the trial court ruled that he could testify only as to his impressions at the time he examined an umbilical cord (*Province, supra,* 20 Cal.App.4th at p. 1681), the appellate court found that the trial court ended up allowing the pathologist's testimony to exceed this limitation and touch on topics of expert opinion. (*Id.* at pp. 1683–1684.) The court concluded that, on retrial, unless the pathologist was designated as an expert and his deposition allowed, "[t]he trial court must limit his testimony to percipient observations . . . ." (*Id.* at p. 1684.)

▇ *Carson v. Facilities Development Co.* (1984) 36 Cal.3d 830 [206 Cal.Rptr. 136, 686 P.2d 656] explained at page 844: " '[T]he decisive consideration in determining the admissibility of expert opinion evidence is whether the subject of inquiry is one of such common knowledge that men of ordinary education could reach a conclusion as intelligently as the witness or whether, on the other hand, the matter is sufficiently beyond common experience that the opinion of an expert would assist the trier of fact.' (*People* v. *Cole* (1956) 47 Cal.2d 99, 103 [301 P.2d 854]; *Miller* v. *Los Angeles County Flood Control Dist.* [(1973)] 8 Cal.3d 689, 702 [106 Cal.Rptr. 1, 505 P.2d 193]; see also Evid. Code, § 801, subd. (a).) Expert opinion evidence is required in some circumstances. 'If the matter in issue is one within the knowledge of experts *only* and not within the common knowledge of laymen, it is necessary for the plaintiff to introduce expert opinion evidence in order to establish a prima facie case.' (*Miller* v. *Los Angeles County Flood Control Dist., supra,* 8 Cal.3d at p. 702 . . . ; accord *Lawless* v. *Calaway* [(1944)] 24 Cal.2d 81, 86 [147 P.2d 604].) [¶] . . . [¶] However,

appellate courts have repeatedly held that expert testimony is unnecessary to a plaintiff's case where the fact sought to be proved is one within the general knowledge of laymen."

 In a California Environmental Quality Act (Pub. Resources Code, § 21000 et seq.) action, *Bowman v. City of Berkeley* (2004) 122 Cal.App.4th 572 [18 Cal.Rptr.3d 814] made the following pertinent observations on page 583: "Statements of area residents who are not environmental experts may qualify as substantial evidence if they are based on relevant personal observations or involve 'nontechnical' issues. (*Ocean View Estates Homeowners Assn., Inc. v. Montecito Water Dist.* (2004) 116 Cal.App.4th 396, 402 [10 Cal.Rptr.3d 451] [aesthetics]; *Oro Fino Gold Mining Corp. v. County of El Dorado* (1990) 225 Cal.App.3d 872, 882 [274 Cal.Rptr. 720] [noise]; *Citizens Assn. for Sensible Development of Bishop Area v. County of Inyo* (1985) 172 Cal.App.3d 151, 172 [217 Cal.Rptr. 893] [traffic].) However, a complex scientific issue such as the migration of chemicals through land calls for expert evaluation . . . ."

We have reviewed some of the letters drafted by Liu and sent to Gustafson. For example, a seven-page typed letter dated November 21, 2003, included comments on a written report dated June 24, 2003, prepared by Gustafson's experts. The report drew a variety of conclusions about the contamination based on soil and groundwater samples from several boreholes. "Petroleum hydrocarbons, categorized by the laboratory as bunker oil, diesel, hydraulic oil, and motor oil, were again found in soil and groundwater within the" downhill property. "The lateral extent of the contamination . . . apparently has not been completely defined." The Water Board disagreed with the report's conclusions about the source and the extent of the contamination, based on its own interpretation of chemical analyses of the results of the samplings.

It is well within the scope of lay opinion that water runs downhill. It may be within common knowledge that groundwater will likewise flow downhill underground. However, plaintiff cannot seriously contend that the migration of hydrocarbons through soil and the interpretation of soil borings to discover the extent of contamination are proper subjects for lay opinion. We are inclined to believe that the trial court would have abused its discretion had it allowed Liu to provide the testimony desired by plaintiff. We conclude that there was no error in disallowing an undisclosed expert from providing expert opinions about soil contamination and abatement based on his expertise, even if some of his opinions were based on his personal observations of the contaminated sites. (Cf. *Kalaba v. Gray* (2002) 95 Cal.App.4th 1416, 1422–1423 [116 Cal.Rptr.2d 570] [trial court acted within its discretion in excluding expert testimony by treating physicians who were not designated by name as experts]; *FMC Corp. v. Plaisted and Companies* (1998) 61

Cal.App.4th 1132, 1216 [72 Cal.Rptr.2d 467] [no error in excluding opinions of undisclosed experts developed " 'during their hands-on involvement in the contaminant characterization and remedial treatment feasibility studies' "].)

We conclude the trial court made no mistake in precluding either Polvado or Liu from testifying about what kinds of remediation might be reasonable. Liu was unable to provide expert testimony because plaintiff did not designate him as an expert. While Polvado was designated as an expert, he was properly restricted to the opinions he expressed at his deposition, which did not reach this topic.

### B. *The Denial of Motion to Amend Complaint*

Plaintiff asserts a variety of errors resulting from the denial of her motion to file an amended complaint.

#### 1. *The Essence of the Proposed Amendments*

Plaintiff asserts that the trial court erred in denying her motion to file an amended complaint a month before the scheduled trial date and two months after the trial court had granted summary adjudication to the Gustafson defendants. She states: "The purpose of the Amended Complaint was to accurately and completely allege viable negligence causes of action for conduct after 1986, the cause of action for nuisance per se, and clarify the statutory definitions of a pollution release . . . by which definition the number of negligent acts increased." Plaintiff sought to allege "[s]pecific numerous new acts of negligence by Gustafson which began in 1993," namely "failure to install monitoring wells after 1990," "failure to collect data from the wells," "failure to furnish technical data to the State regarding the data produced from the monitoring wells," "failure to install curtain drains to protect subsurface leaching onto Plaintiff's property in 1993" and "failure to abate the oil contamination in the post holes of the retaining wall on Defendants' property prior to construction of the wall."[24] "Plaintiffs did not actually learn that there had been negligent 1993 cleanup by Gustafson until 1999 when Plaintiffs were digging a trench for a curtain drain and found subsurface groundwater containing oil."

Defendants respond in part, "If Plaintiff knew in 1999 about the 1995 oil observation [in the postholes] and the allegedly inadequate clean-up attempt in 1993, what good cause is there to permit an amendment so many years after the fact to allege those events?"

---

[24] We note that three of these alleged omissions sound like the same thing. Having allegedly failed to install monitoring wells, defendants could hardly have collected data from nonexistent wells or provided that data to the government.

*Melican v. Regents of University of California* (2007) 151 Cal.App.4th 168 [59 Cal.Rptr.3d 672] reviewed the applicable law on page 175: " ' "[T]he trial court has wide discretion in allowing the amendment of any pleading [citations], [and] as a matter of policy the ruling of the trial court in such matters will be upheld unless a manifest or gross abuse of discretion is shown. [Citations.]" ' [Citation.] Nevertheless, it is also true that courts generally should permit amendment to the complaint at any stage of the proceedings, up to and including trial. [Citations.] But this policy applies ' "only '[w]here no prejudice is shown to the adverse party.' " ' [Citation.] Moreover, ' " 'even if a good amendment is proposed in proper form, unwarranted delay in presenting it may—of itself—be a valid reason for denial.' " ' [Citations.] Thus, appellate courts are less likely to find an abuse of discretion where, for example, the proposed amendment is ' "offered after long unexplained delay . . . or where there is a lack of diligence . . . ." ' [Citation.]"

■ Plaintiff's argument for leave to amend exhibits a common confusion between individual negligent acts and a cause of action. Allegations of negligence have long been exempted from the code pleading requirement to state the facts constituting the cause of action. (*Rannard v. Lockheed Aircraft Corp.* (1945) 26 Cal.2d 149, 154 [157 P.2d 1].) Negligence may be generally pleaded and the enumeration of specific negligent acts in a complaint does not limit the plaintiff's proof at trial unless that is the pleader's clear intent. (*Nielsen v. Milligan* (1950) 100 Cal.App.2d 40, 44 [222 P.2d 916].)

■ More fundamentally, it is not the number of negligent acts that establishes a cause of action for negligence. A cause of action arises when a defendant has violated a plaintiff's primary right. In *Quiroz v. Seventh Ave. Center* (2006) 140 Cal.App.4th 1256 [45 Cal.Rptr.3d 222] (*Quiroz*), this court explained the following on page 1277 in footnote 25: "For pleading purposes, whether a complaint in fact asserts one or more discrete causes of action depends on whether it alleges an invasion of one or more primary rights. (*Hindin v. Rust* (2004) 118 Cal.App.4th 1247, 1255–1258 [13 Cal.Rptr.3d 668].) 'The primary right theory is a theory of code pleading that has long been followed in California. It provides that a "cause of action" [comprises] a "primary right" of the plaintiff, a corresponding "primary duty" of the defendant, and a wrongful act by the defendant constituting a breach of that duty. [Citation.] The most salient characteristic of a primary right is that it is indivisible: the violation of a single primary right gives rise to but a single cause of action. [Citation.]' (*Crowley v. Katleman* (1994) 8 Cal.4th 666, 681 [34 Cal.Rptr.2d 386, 881 P.2d 1083].) 'As far as its content is concerned, the primary right is simply the plaintiff's right to be free from the particular injury suffered. [Citation.] *It must therefore be distinguished from the legal theory on which liability for that injury is premised.*' (*Ibid.*, italics added.) 'The manner in which a plaintiff elects to organize his or her claims within

the body of the complaint is irrelevant to determining the number of causes of action alleged under the primary right theory.' (*Hindin v. Rust, supra*, 118 Cal.App.4th at p. 1257.) The violation of a single primary right still gives rise to only one 'cause of action,' even if a plaintiff seeks various forms or theories of relief. (*Jenkins v. Pope* (1990) 217 Cal.App.3d 1292, 1300, fn. 3 [266 Cal.Rptr. 557].)"

Applying that approach in *Quiroz*, this court concluded that the trial court "correctly viewed the untimely survivor cause of action as pleading a different injury than the original cause of action for wrongful death." (*Quiroz, supra*, 140 Cal.App.4th at p. 1279.) "This new claim was first asserted after the running of the statute of limitations, and because the injuries to be compensated by the two claims are different, the relation-back doctrine does not apply." (*Ibid.*)

*Crowley v. Katleman, supra*, 8 Cal.4th 666 stated, "The primary right theory has a fairly narrow field of application. It is invoked most often when a plaintiff attempts to divide a primary right and enforce it in two suits." (*Id.* at p. 682.) But the California Supreme Court has essentially employed a primary right analysis when called on to select which statute of limitations applies.

In *Leeper v. Beltrami* (1959) 53 Cal.2d 195 [1 Cal.Rptr. 12, 347 P.2d 12], the court reviewed case law before observing: "It is apparent that, where a plaintiff brings an action to recover real property either by a quiet title action or by a suit to cancel or set aside a deed, and his success depends upon the ability to show that defendant was guilty of fraud or duress, there is considerable confusion in the cases as to which limitation statute applies. At least three different statutes have been held applicable—section 318, the section fixing a five-year period for the recovery of real property; section 343, the section providing a four-year period for actions not otherwise covered; and section 338, subdivision (4), the section providing for a three-year period after discovery for fraud actions. . . . *This confusion apparently arises out of the failure of the cases to consider adequately the basic rights of the plaintiff arising out of defendant's wrongful conduct*, and the failure to consider the substantive rules applicable to these basic rights." (*Id.* at pp. 212–213, italics added.) After reviewing more case law, the court stated: "Thus the modern tendency is to look beyond the relief sought, and *to view the matter from the basic cause of action giving rise to the plaintiff's right to relief.* This approach is a sensible one." (*Id.* at p. 214, italics added.) The court concluded that a stated rescission claim arose from one defendant's fraud. (*Ibid.*) As to two other defendants, the court stated, "*the basic nature of the wrongdoing* of these defendants is duress." (*Id.* at p. 207, italics added.) The court concluded that for purposes of the statute of limitations, duress was fraud, and "it must

be held that subdivision four of section 338 is applicable where the gravamen of plaintiff's action is duress." (*Id.* at p. 208.)

In *County of San Diego v. Sanfax Corp.* (1977) 19 Cal.3d 862 [140 Cal.Rptr. 638, 568 P.2d 363], the court was again called on to select between two potentially applicable statutes of limitations. "On their face, both statutes appear to apply. The county's action, brought under Labor Code section 3852, is '[a]n action upon a liability created by statute.' (Code Civ. Proc., § 338, subd. 1.) It appears to be equally true, however, that, in bringing suit, the county seeks to recover 'for injury . . . caused by the wrongful act or neglect of another.' (Code Civ. Proc., § 340, subd. 3.) Although both statutes apparently are pertinent, this court and the Courts of Appeal have consistently held that the one-year statute in fact governs." (*Id.* at pp. 871–872.) The court went on to explain that the three-year "statutory" statute of limitations was applied when "the statute itself, and not a contract or general principles of tort law, serves as the source of the court's rule of decision if the court reaches the merits." (*Id.* at p. 877.) "Similarly, courts commonly apply 'contract' statutes of limitations (e.g., Code Civ. Proc., § 337, subd. 1) in cases in which they would treat a contract as the source of the substantive rights or duties of the litigants." (*Ibid.*) "We have typically taken an analogous approach in deciding whether the one-year 'tort' statute of limitations governs. If principles of tort law determine liability, the one-year statute applies, even if the underlying duty derives from contract [citation] or from statute. [Citation.]" (*Id.* at p. 878.)

While not using the phrase "primary right," both of these opinions looked to the underlying nature of the injury asserted by the plaintiffs to determine the applicable statute of limitations.

██ An opinion by this court illustrates that it is the underlying injury and not the legal theories of recovery superimposed on the injury that dictates the applicable statute of limitations. In *CAMSI IV v. Hunter Technology Corp.* (1991) 230 Cal.App.3d 1525 [282 Cal.Rptr. 80] (*CAMSI IV*), the buyer of real property sued the seller on theories of negligence, negligence per se, and strict liability for contaminating the soil and groundwater with volatile organic chemicals. This court reviewed whether a demurrer was properly sustained based on the statute of limitations. We stated, "it is apparent as an abstract proposition, and has been assumed in a number of cases, that for limitations purposes the harm implicit in a tortious injury to property is harm to the property itself, and thus to *any* owner of the property once the property has been injured and not necessarily to a particular owner." (*Id.* at pp. 1534–1535.) "An owner must bring its claim to court within the statutory period or the claim will be barred *for that and all subsequent owners.* Normally a subsequent owner will not be personally harmed by the tort until

he or she becomes the owner, but no case has held that each new owner thus becomes entitled to a new statute of limitations against the tortfeasor. Such a rule would wholly disregard the repose function of statutes of limitations." (*Id.* at p. 1535.) Even extending the statute of limitations until the discovery of the harm to the property, we concluded "as a matter of law, from the allegations of the second amended complaint, that as of July 1985 CAMSI IV possessed information sufficient at least to place it on notice of serious contamination problems on the parcel it owned, and from which by exercise of reasonable diligence it could have learned the full extent of the problems and the nature of their source." (*Id.* at p. 1538.) Therefore, the plaintiff's claims for negligence were barred by the three-year statute of limitations for injuries to real property. (Cf. *Beck, supra,* 44 Cal.App.4th 1160, 1216.)

As already discussed above, the same statute of limitations applies to actions for trespass and injury to real property. In other words, for limitations purposes, the gravamen of a soil contamination claim is that the real property, not any particular owner, has been injured by a condition that has been created, whether deliberately or negligently. The limitations period is not revived each time the property changes owners or occupants.

We have reviewed the primary rights doctrine to establish two points. First, the essence of a cause of action is the invasion of a plaintiff's primary right, not the number of acts and omissions that constitute the invasion. Second, the applicable statute of limitations is determined by identifying the nature of the underlying injury asserted by the plaintiff.

In this case, the trial court did not expressly deny plaintiff's motion to amend her complaint based on her unexplained delay in bringing the motion or its nearness to trial. In ruling on plaintiff's motion to amend the complaint, the trial court correctly perceived that the gravamen of plaintiff's claim, under all legal theories offered, remained that her real property was injured when it was contaminated by bunker oil migrating from defendants' property. The proposed amended complaint did not allege that defendants had released more oil on their own property after the laundry ceased operations. It was not a situation like that in *Starrh* where the defendants were continuing to add wastewater to unlined ponds.

Plaintiff sought to allege that the cleanup efforts in 1993 (which we note were monitored and approved by the Health Department) were inadequate and negligent because they failed to remove all contamination from defendants' property and failed to prevent its continued downhill migration. In other words, defendants had failed to abate the existing contamination, and plaintiff's soil remained contaminated by bunker oil, as it had been since 1986. The allegations of these details would not have altered or expanded the essential nature of plaintiff's existing causes of action.

KFC Western, Inc. v. Meghrig (1994) 23 Cal.App.4th 1167 [28 Cal.Rptr.2d 676], which predated *Mangini II*, stated on page 1180: "If a nuisance is permanent, the plaintiff ordinarily must bring one action for all past, present and future damage within three years after the permanent nuisance is created. (*Baker* v. *Burbank-Glendale-Pasadena Airport Authority*[, *supra*,] 39 Cal.3d 862, 868–869 . . . .) If on the other hand the nuisance is continuing, every repetition of the continuing nuisance is a separate wrong, subject to a new and separate limitation period for which the plaintiff may bring successive actions for damages until the nuisance is abated even though an action based on the original wrong may be barred. (*Phillips* v. *City of Pasadena* (1945) 27 Cal.2d 104, 107–108 [162 P.2d 625]; *Capogeannis* v. *Superior Court, supra*, 12 Cal.App.4th at p. 676.)" "A *private* nuisance is a ' "civil wrong" ' [citations], which by definition is tortious." (*Id.* at pp. 1181–1182.) A continuing trespass also involves tortious conduct. (*Id.* at p. 1181.)

We reach two conclusions about the denial of plaintiff's motion to file an amended complaint. First, the trial court did not err in determining that the proposed details added nothing to alter or enlarge plaintiff's essential causes of action for soil pollution. Plaintiff's primary right was to avoid injury to her soil by underground contamination. The proposed amendments did not create a new and different cause of action that would avoid the statute of limitations applicable to a permanent nuisance. The allegations of a negligent cleanup in 1993 and an omission to abate the oil in the fencepost holes were aimed at establishing that the injury was continuing, but she was allowed to go to trial on claims of continuing nuisance and trespass.

Second, we conclude that plaintiff was not prejudiced by the denial of her motion. We note that she was allowed to put on the evidence contemplated by her proposed amendments. As summarized above, there was detailed evidence about Gustafson's cleanup efforts in 1993 and about the discovery of oil in the fencepost holes during the Finklang defendants' later renovation of part of the laundry property. Her expert, Burns, testified that the cleanup was unsuccessful in removing all sources of contamination on the laundry property. He even described how the erection of a retaining wall could help mobilize contaminants in the soil.

The denial of plaintiff's motion to file an amended complaint did not prevent plaintiff from proving the facts stated in her proposed amended complaint. Since plaintiff was allowed to put on the evidence detailed in her proposed new allegations, she is unable to demonstrate that she was prejudiced by the court's ruling. (Cf. *McAllister* v. *Metzger* (1963) 220 Cal.App.2d 692, 701 [33 Cal.Rptr. 879].) Plaintiff's problem at trial was not that she was precluded from introducing any of the allegedly negligent omissions by

defendants after the oil was released, but that she offered no proof that the contamination of her property could be reasonably abated and was therefore continuing.

### 2. *Purported Later Requests to Amend the Complaint*

Plaintiff further contends that the trial court repeatedly denied her requests to file an amended complaint. She asserts that the trial court denied such a request during the hearing on June 28, 2006, on the motions in limine. At one point, the trial court asked Attorney Clack if she had specifically sought the remedy of abatement in the complaint. Clack contended that the facts alleged justified several remedies, including abatement. She stated, "I would then make a request to amend, if we need to do that, because it is exactly what we have been talking about." The following day of trial, July 5, 2006, the court announced, regarding a prayer for "abatement/remediation, it dawned on me that that's an equitable remedy and, therefore, would not be one that would be proper for the jury but for the Court to make injunctive orders." In other words, the court recognized that there was no need for plaintiff to amend the prayer of the complaint.

Plaintiff also asserts that she "further moved to amend the complaint based on new evidence elicited at trial." In violation of California Rules of Court, rule 8.204(a)(1)(C), plaintiff fails to provide any record reference in support of this contention, and we have not independently discovered any supporting factual basis.

### C. *The Grant of Summary Adjudication*

Plaintiff contends that the court erred in granting defendants' motion for summary adjudication that, except for claims of continuing nuisance and trespass, her other claims were barred by the statute of limitations.

Plaintiff asserts that the trial court erred in granting summary adjudication on her negligence claims because it was undisputed that she did not discover that her soil was contaminated until 1999, when trenching work revealed oil in the groundwater, and when she had a soil sample tested.

In *County of Santa Clara v. Atlantic Richfield Co.* (2006) 137 Cal.App.4th 292 [40 Cal.Rptr.3d 313], this court stated on page 316. " 'Appellate review of a ruling on a summary judgment or summary adjudication motion is de novo.' (*Brassinga v. City of Mountain View* (1998) 66 Cal.App.4th 195, 210 [77 Cal.Rptr.2d 660].) 'While resolution of the statute of limitations issue is normally a question of fact, where the uncontradicted facts established through discovery are susceptible of only one legitimate inference, summary

judgment is proper.' (*Jolly v. Eli Lilly & Co.* (1988) 44 Cal.3d 1103, 1112 [245 Cal.Rptr. 658, 751 P.2d 923].)"

 *Mangini I, supra,* 230 Cal.App.3d 1125 explained on pages 1149 and 1150: "The traditional rule is that a statute of limitations begins to run upon the occurrence of the last element essential to the cause of action, even if the plaintiff is unaware of his cause of action. (*Leaf* v. *City of San Mateo* (1980) 104 Cal.App.3d 398, 406 [163 Cal.Rptr. 711].) The harshness of that rule has been ameliorated in cases where it would be manifestly unjust to deprive a plaintiff of a cause of action before he is aware he has been injured. (*Ibid.*) A cause of action under this discovery rule accrues when ' "plaintiff either (1) actually discovered his injury and *its negligent cause* or (2) could have discovered injury and *cause* through the exercise of reasonable diligence [italics added]." ' (*Id.* at p. 407, citing *Sanchez* v. *South Hoover Hospital* (1976) 18 Cal.3d 93, 96–97 [132 Cal.Rptr. 657, 553 P.2d 1129].) The limitations period begins once the plaintiff has notice or information of circumstances to put a reasonable person on inquiry. (*Jolly* v. *Eli Lilly & Co.*[, *supra,*] 44 Cal.3d 1103, 1110–1111 . . . .) Subjective suspicion is not required. If a person becomes aware of facts which would make a reasonably prudent person suspicious, he or she has a duty to investigate further and is charged with knowledge of matters which would have been revealed by such an investigation. (*Ibid.*; *Miller* v. *Bechtel Corp.* (1983) 33 Cal.3d 868, 875 [191 Cal.Rptr. 619, 663 P.2d 177].)" (Fns. omitted.)

Plaintiff asserts that in response to defendants' motion for summary adjudication, she presented the following undisputed facts. "Gustafson conducted a cleanup in 1993 . . . ; . . . Plaintiff did not discover that substantial hidden oil pollution remained after the 1993 cleanup until 1999, when during soil excavation on Plaintiff's land to install a curtain drain (groundwater diversion), oil immediately surfaced." She also contends that her soil had not been tested until after July 1999.[25]

Plaintiff argues that the statute of limitations did not begin to run until there was "appreciable and actual harm," which "occurred after confirmation of the soil sample showed high levels of petroleum contamination were present in the soil and groundwater underneath the property." "No continuing oil contamination could have been observed before 1999 because it was subsurface, hidden underground."

As this court observed in *CAMSI IV, supra,* 230 Cal.App.3d 1525, "CAMSI IV's harm argument appears to confuse *harm* with *discovery* of

---

[25] This last "fact" is not among the 93 facts asserted by plaintiff to be undisputed in her separate statement of undisputed facts and supported by citations to the record. Instead, it appears as part of the argument in plaintiff's points and authorities in opposition to the motion for summary adjudication.

harm. [Citations.] Both are relevant to commencement of the limitation period, but they must be analyzed separately." (*Id.* at p. 1536.) "[F]or limitations purposes the harm implicit in a tortious injury to property is harm to the property itself . . . ." (*Id.* at p. 1534.)

Plaintiff's position seems to be that the downhill property was not appreciably harmed by underground oil migration until she observed the presence of oil contamination in her groundwater and had it confirmed by an expert test.

*Wilshire Westwood Associates v. Atlantic Richfield Co.* (1993) 20 Cal.App.4th 732 [24 Cal.Rptr.2d 562] (*Wilshire Westwood Associates*) demonstrates that expert confirmation is not a prerequisite to the discovery that one's soil has been contaminated by oil. In that case, the plaintiffs bought property on which a gas station had been located subject to the plaintiffs' examination of the premises, including the soil. The plaintiffs relied on the advice of a soils consultant, who apparently misinterpreted earlier soil borings and told them to expect no soil problem. (*Id.* at p. 738.) They discovered gasoline in the soil when they began excavating the soil three and one-half years after buying the property. The court said the following about the discovery rule on page 740: "Under this rule, '[p]ossession of "presumptive" as well as "actual" knowledge will commence the running of the statute.' (*Sanchez* v. *South Hoover Hospital*[, *supra*,] 18 Cal.3d 93, 101 . . . .) A plaintiff is charged with 'presumptive' knowledge so as to commence the running of the statute once he or she has ' "notice or information of circumstances to put a reasonable person on inquiry, or has the opportunity to obtain knowledge from sources open to his investigation . . . ." ' (*Ibid.*, italics omitted; see also *Gutierrez* v. *Mofid* (1985) 39 Cal.3d 892, 896–897 [218 Cal.Rptr. 313, 705 P.2d 886].)" (Cf. *Alfaro v. Community Housing Improvement System & Planning Assn., Inc.* (2009) 171 Cal.App.4th 1356, 1388–1389 [89 Cal.Rptr.3d 659].)

The court concluded: "Appellants were on inquiry, pursuant to their purchase agreement, as to the condition of the soil. They sought out and engaged professionals for advice about the soil condition. The advice they received should have, but did not, inform them of the gasoline contamination. Following *Gutierrez*, we conclude that the burden of this incorrect advice must fall on appellants, not on the wholly uninvolved respondents." (*Wilshire Westwood Associates, supra*, 20 Cal.App.4th at p. 741, fn. omitted.)

Margaret McCoy was aware of oil seeping on her property from the laundry property in 1986. As defendants contend, "Plaintiff was on notice after 1986 that oil could continue to migrate from the old Laundry site to the McCoy lot." Plaintiff has not claimed that she was lulled by the 1993 Health

Department clearance letter into believing that the excavation of the laundry property had somehow decontaminated her own soil. Though Cecelia McCoy may not have been aware of the polluted soil on her property until she moved onto the property, for purposes of this action, she stands in the shoes of her mother, who complained about the oil in 1986.

We repeat our quotation of *CAMSI IV*. "An owner must bring its claim to court within the statutory period or the claim will be barred *for that and all subsequent owners*. Normally a subsequent owner will not be personally harmed by the tort until he or she becomes the owner, but no case has held that each new owner thus becomes entitled to a new statute of limitations against the tortfeasor. Such a rule would wholly disregard the repose function of statutes of limitations." (*CAMSI IV, supra*, 230 Cal.App.3d 1525, 1535.)

Cecelia McCoy is unable to extend the statute of limitations applicable to a permanent nuisance and trespass by asserting her own personal discovery of contamination that apparently had been unabated since 1986. The trial court properly granted defendants' motion for summary adjudication on plaintiff's negligence claim.

Under the general topic heading "The trial court abused its discretion by denying plaintiff leave to file an amended complaint" (capitalization omitted), plaintiff asserts, "The trial court abused its discretion removing Plaintiff's cause of action for nuisance per se because state and federal statutes establish requirements which were ignored by Gustafson."

What plaintiff is referring to with this contention is that, during the motions in limine hearing, the trial court expanded its summary adjudication ruling to apply to plaintiff's nuisance per se claim.

*Beck, supra*, 44 Cal.App.4th 1160 explained on pages 1206 and 1207: "The concept of a nuisance per se arises when a legislative body with appropriate jurisdiction, in the exercise of the police power, expressly declares a particular object or substance, activity, or circumstance, to be a nuisance. Generally a nuisance is defined as '[a]nything which is injurious to health, or is indecent or offensive to the senses, or an obstruction to the free use of property, so as to interfere with the comfortable enjoyment of life or property, or unlawfully obstructs the free passage or use, in the customary manner, of any navigable lake, or river, bay, stream, canal, or basin, or any public park, square, street, or highway . . . .' (Civ. Code, § 3479.) This requires consideration and balancing of a variety of factors. [Citations.] However, where the law expressly declares something to be a nuisance, then no inquiry beyond its existence need be made and in this sense its mere existence is said to be a nuisance per se. [Citation.] But, to rephrase the rule, to be considered a

nuisance per se the object, substance, activity or circumstance at issue must be expressly declared to be a nuisance by its very existence by some applicable law."

Plaintiff quibbles with *Beck*'s conclusion that oil contamination of real property is not a nuisance per se. (*Beck, supra,* 44 Cal.App.4th at pp. 1206–1209.) We need not reach this issue. Plaintiff seeks to apply this doctrine because it would shift the burden of proof to defendants once she proved a violation of some statute. Plaintiff does not contend that a different statute of limitations applies when a permanent nuisance is a nuisance per se. Instructing the jury on this theory of recovery would not have removed plaintiff's burden to prove the contamination was reasonably abatable. While we are inclined to agree with *Beck*'s conclusion, even if we did not, we would conclude that plaintiff has failed to establish prejudice from the trial court not instructing the jury on nuisance per se.[26]

### D. *Inapplicability of Federal Environmental Contamination Law*

Under topic headings asserting error in granting summary adjudication and in denying leave to amend the complaint, plaintiff faults the trial court for keeping federal law on hazardous substance disposal out of this case.

Plaintiff contends "[t]he trial court erred by dismissing Plaintiff's cause of action for negligence when it denied application of the federal statutory provision for accrual of the statute of limitations in pollution cases." Also, "[t]he trial court abused its discretion by refusing Plaintiff's request to amend the complaint for the federal statutory definition of release under the Comprehensive Environmental Release Compensation and Liability Act (CERCLA) 42 U.S.C. § 9601 and California Health and Safety Code § 25320." "Plaintiff sought to use both definitions because they broadened the extent of the oil contamination on Plaintiff's property, thereby increasing the actual harm to Plaintiff's property and loss of use and enjoyment damages."

---

[26] On appeal, plaintiff also challenges the trial court's summary adjudication and subsequent rulings that plaintiff was not entitled to recover diminution of property value on a theory of continuing nuisance or trespass. In view of our conclusion that the jury properly did not reach the question of compensatory damages for nuisance or trespass, we need not reach this contention.

To the extent plaintiff continues to assert that, as the property owner, she should have been able to read DMC Construction's excavation estimates to the jury, we quote *Le Brun v. Richards* (1930) 210 Cal. 308 [291 P. 825]: "An owner of property may, without being qualified as an expert on values, testify as to his opinion of the value of that which he owns [citations]. This rule, however, does not extend to the giving of testimony as to the cost of repairs, especially where such testimony is merely a repetition of the statements of other persons to the witness." (*Id.* at pp. 319–320.)

What plaintiff characterizes as the trial court rejecting application of the federal statute of limitations occurred during trial at a hearing in the jury's absence on July 10, 2006, after defendant Galen Blackwell testified. At the end of the day, in the jury's absence, Blackwell made a motion for nonsuit.[27] Attorney Clack objected to the motion "on the basis of the date of discovery—for the same reason we objected to the summary adjudication. But that the date of discovery of the negligent cleanup is within the statute of limitation, and also based on CERCLA's required mandatory date of discovery and continuing nuisance to begin at the date of discovery of the harm, which is the negligent cleanup." She claimed that she was barred by pretrial rulings from talking about CERCLA's rule of discovery applicable to negligence. She asserted that due to the court's rulings, she was prevented from bringing evidence that would establish Galen Blackwell's liability.[28] The court granted Blackwell's motion for nonsuit.

On appeal, plaintiff asserts that "CERCLA expressly preempts state statutes of limitations which the trial court used in this case." Plaintiff cites no authority for this claim, which is contrary to the applicable law, as defendants point out.

CERCLA does not impose a different statute of limitations for the claims here. *Angeles Chemical Co. v. Spencer & Jones* (1996) 44 Cal.App.4th 112 [51 Cal.Rptr.2d 594] explained at pages 123 and 124: "[S]ection 309 of CERCLA 'creates a federally mandated discovery rule for the accrual of state law claims involving releases of hazardous substances that cause or contribute to personal injury or property damage.' [Citations.] 'Practically speaking, CERCLA essentially preempts state statutes of limitations if those state law claims are based upon exposure to hazardous substances released into the environment and the applicable limitations period provides for an earlier commencement date than federal law.' [Citation.]

"Where a state does not apply the discovery rule to claims for property damage caused by toxic contamination, CERCLA mandates that the state statute of limitations begin to run when the plaintiff discovers, or should have discovered, the injury and its cause. [Citations.] In contrast, where a state applies the discovery rule, such that the statute of limitations commences on the same date under both state law and CERCLA, there is no federal preemption. [Citations.]" (Cf. *O'Connor v. Boeing North American, Inc.* (9th Cir. 2002) 311 F.3d 1139, 1146–1147.)

[27] While the reporter's transcript indicates there was a written motion, it has not been included in the clerk's transcript.

[28] As defendants point out, the record on appeal contains no prior ruling that barred plaintiff from invoking CERCLA's statute of limitations. Plaintiff did not cite CERCLA in her written opposition to either motion for summary adjudication. We have not been provided the reporter's transcripts of the hearings on these motions.

In this case, the three-year statute of limitations for injury to real property by a permanent nuisance began running when Margaret McCoy discovered bunker oil on the downhill property in 1986. Our analysis above has given plaintiff the benefit of the discovery rule. CERCLA does not delay the accrual of this cause of action beyond this date. (Cf. *Village of Milford v. K-H Holding Corp.* (6th Cir. 2004) 390 F.3d 926, 931 ["We conclude that both CERCLA and Michigan law provide the same commencement date, and that this date was more than three years before Milford filed its suit."].) Assuming for the sake of discussion that some ruling by the trial court barred plaintiff from asserting that CERCLA extended the statute of limitations in section 338, subdivision (b), there was no error.

Regarding plaintiff's claim that she "moved to amended [*sic*] the complaint alleging numerous conditions of pollution . . . [that] met the statutory definitions of a release," we find she has cited a nonexistent page in the reporter's transcript. We find no record support for plaintiff's claim that the proposed amended complaint contained any federal or state statutory definitions of release. In a proposed second cause of action for negligence per se, plaintiff did allege there were violations of the state Health and Safety Code and CERCLA. As the Gustafson defendants point out, the only CERCLA violation alleged was against the Finklang defendants.

During argument on the motions in limine on June 28, 2006, plaintiff did quote the definition of "release" in Health and Safety Code section 25320 and she asserted that "When you do not stop a nuisance, and it flows again, that constitutes a release in the eyes of [CERCLA] and all the applicable laws including the Health and Safety Code." This statement was not accompanied by a request to amend the complaint, and it was not made during the hearing on the motion to amend the complaint. The trial court cannot be faulted for failing to rule on requests that plaintiff did not make.

Pursuing plaintiff's argument further, it appears that her real objection is to the definition of "release" provided in the jury instructions. On appeal plaintiff asserts that the definitions of "release" in CERCLA and in Health and Safety Code section 25320 are broader and expand the scope of a continuing nuisance. Plaintiff did ask the court to include these definitions in the jury instructions. The court ruled, "That statute would not be applicable to the case. Therefore, there's no basis for me to give that statute to the jury."

Health and Safety Code section 25320, part of the Carpenter-Presley-Tanner Hazardous Substance Account Act (Health & Saf. Code, § 25300 et seq.), states: " 'Release' means any spilling, leaking, pumping, pouring, emitting, emptying, discharging, injecting, escaping, leaching, dumping, or disposing into the environment." That act specifically excludes as a hazardous

substance "[p]etroleum, including crude oil or any fraction thereof which is not otherwise specifically listed or designated as a hazardous substance in subdivisions (a) to (f), inclusive, of Section 25316." (Health & Saf. Code, § 25317, subd. (a); see *KFC Western, Inc. v. Meghrig, supra*, 23 Cal.App.4th 1167, 1174–1175.)

Similarly, under CERCLA, " '[t]he term "release" means any spilling, leaking, pumping, pouring, emitting, emptying, discharging, injecting, escaping, leaching, dumping, or disposing into the environment (including the abandonment or discarding of barrels, containers, and other closed receptacles containing any hazardous substance or pollutant or contaminant) . . . .' (42 U.S.C. § 9601(22).)" (*Rivas v. Safety-Kleen Corp.* (2002) 98 Cal.App.4th 218, 232 [119 Cal.Rptr.2d 503].)[29]

CERCLA also excludes petroleum as a hazardous substance. (42 U.S.C. § 9601(14); *Petrovic v. Amoco Oil Co.* (8th Cir. 1999) 200 F.3d 1140, 1153–1154.) "The petroleum exclusion includes fuel oil and leaded gasoline, *Wilshire Westwood Associates v. Atlantic Richfield Corp.*, [*supra,*] 881 F.2d 801, 803, 810 . . . ; *Andritz Sprout-Bauer, Inc. v. Beazer East Inc.*, 12 F.Supp.2d 391, 410 (M.D.Pa.1998) (gasoline), and any indigenous components in refined or unrefined gasoline or any such components added in the refining process even if the components would by themselves be considered hazardous substances. *United States v. Alcan Aluminum Corp.*, 964 F.2d 252, 266–67 (3d Cir. 1992); *Wilshire*, 881 F.2d at 810." (*Two Rivers Terminal, L.P. v. Chevron USA, Inc.* (M.D.Pa. 2000) 96 F.Supp.2d 432, 443.)

Without some expert testimony that the bunker oil in this case qualified as a hazardous substance under federal or state law, the trial court was justified in not instructing the jury in terms of inapplicable statutes. Defendants point out, "Plaintiff did not lay any foundation for the application of CERCLA because she did not show that the oil alleged to have leaked from the Laundry site to the McCoy property came within the definition of 'hazardous substance' as used in" CERCLA.

Moreover, we do not see how an expanded definition of "release" would have affected the outcome of this case. Plaintiff does not suggest, let alone establish, that a different definition of "release" would have allowed her to prove that the contamination of her property was reasonably abatable. Indeed, if she were able to show increased harm under a different definition, it would presumably be even less abatable. We find no error or prejudice in the trial court's refusing to give plaintiff's requested instructions defining "release."

---

[29] It is an open question under CERCLA whether the passive underground migration of contaminants amounts to a release. (Compare *Pakootas v. Teck Cominco Metals, Ltd.* (9th Cir. 2006) 452 F.3d 1066, 1075 with *ABB Indus. Systems, Inc. v. Prime Technology, Inc.* (2d Cir. 1997) 120 F.3d 351, 358.)

## VII. DISPOSITION

The order granting a new trial is reversed. The order denying defendants' motion for judgment notwithstanding the verdict is reversed. The trial court is directed to enter judgment in favor of defendants. Defendants are entitled to costs on appeal.

Premo, J., and Elia, J., concurred.

The petition of appellant Cecelia McCoy for review by the Supreme Court was denied March 10, 2010, S179771.